Alok Ahuja, Judge, dissenting.
The majority holds that the circuit court was not required to conduct a sua sponte inquiry into the performance of Waggoner's appointed counsel. According to the majority, no independent inquiry was required because counsel showed some "signs of life" by filing an "amended" post-conviction relief motion which reproduced Waggoner's pro se motion with inconsequential changes. The majority apparently concludes that, so long as appointed counsel files something which purports to be an "amended" motion, counsel has discharged his or her performance obligations under Supreme Court Rule 29.15(e), and no further inquiry is required (or even permitted).
I respectfully dissent. Contrary to the majority opinion, multiple cases hold that an abandonment inquiry is required even if counsel took some action on a movant's behalf. Indeed, the Missouri Supreme Court has expressly recognized that "[a]n amended motion ... has been deemed a nullity when counsel merely replicated a facially deficient pro se motion." Stanley v. State , 420 S.W.3d 532, 542 (Mo. banc 2014). Notably, the Supreme Court supported the quoted statement in Stanley with a favorable citation to Pope v. State , 87 S.W.3d 425 (Mo. App. W.D. 2002) -a case which the majority now (apparently) holds has been overruled.
In this case, appointed counsel filed an "amended" post-conviction relief motion which reproduced Waggoner's pro se motion with only perfunctory changes. (The "amended" motion is attached as an Appendix to this opinion.) Despite the majority's valiant efforts to magnify their significance, none of the few revisions made by counsel give any indication that counsel fulfilled her obligations under Rule 29.15(e) "to investigate the claims raised in the inmate's initial motion," and to independently determine whether additional facts, or additional claims, were available and needed to be asserted. Price v. State , 422 S.W.3d 292, 297 (Mo. banc 2014). Because "[the] record does not indicate whether appointed counsel made the determinations *609 required by Rule 29.15(e)," this "creates a presumption that counsel failed to comply with the rule." Luleff v. State , 807 S.W.2d 495, 498 (Mo. banc 1991). The circuit court was accordingly required to conduct an inquiry into counsel's performance, to determine whether counsel had failed to discharge her obligations under Rule 29.15(e). The judgment should be reversed, and the case remanded to the circuit court for it to conduct the abandonment inquiry required by Luleff .
Discussion
I.
Rule 29.15(e) describes the fundamental obligations of appointed counsel to determine whether the filing of an amended post-conviction relief motion is required. Rule 29.15(e) provides that, after counsel's appointment,
Counsel shall ascertain whether sufficient facts supporting the claims are asserted in the motion and whether the movant has included all claims known to the movant as a basis for attacking the judgment and sentence. If the motion does not assert sufficient facts or include all claims known to the movant, counsel shall file an amended motion that sufficiently alleges the additional facts and claims. If counsel determines that no amended motion shall be filed, counsel shall file a statement setting out facts demonstrating what actions were taken to ensure that (1) all facts supporting the claims are asserted in the pro se motion and (2) all claims known to the movant are alleged in the pro se motion. The statement shall be presented to the movant prior to filing.[2 ]
In Price v. State , 422 S.W.3d 292 (Mo. banc 2014), the Missouri Supreme Court explained the importance of counsel's performance of his obligations under Rule 29.15(e):
When counsel is appointed under Rule 29.15(e), this rule requires this counsel to investigate the claims raised in the inmate's timely initial motion and then file either an amended motion or a statement explaining why no amended motion is needed. Performance of these duties is essential because the limited scope of appellate review under Rule 29.15(j) assumes that "the motion court and appointed counsel will comply with all provisions of the rule." Luleff [v. State ], 807 S.W.2d [495,] at 497-98 [ (Mo. banc 1991) ]. Therefore, Luleff balances the Court's need to enforce the requirements of Rule 29.15(e) and its unwillingness to allow ineffective assistance claims regarding post-conviction counsel by holding that a "complete absence of performance" by appointed counsel is tantamount to a failure of the motion court to appoint counsel under Rule 29.15(e) in the first instance. Id. at 498. Under either scenario, the integrity of the procedures set forth in the rule are compromised and the case cannot proceed as Rule 29.15(e) intends.
Id. at 297-98. We have similarly recognized that counsel must conduct a reasonable investigation in order to discharge counsel's obligation to "ascertain" whether the movant has asserted all known claims and supporting facts.[3]
In Luleff , the Missouri Supreme Court imposed an obligation on circuit courts, in certain circumstances, to act on their own *610 motion to investigate whether appointed counsel has discharged counsel's obligations under Rule 29.15(e). Luleff holds that, where the record fails to reflect that appointed counsel has discharged his obligations under Rule 29.15(e), the circuit court has an obligation to conduct an independent inquiry concerning whether counsel has abandoned the movant.
A record that does not indicate whether appointed counsel made the determinations required by Rule 29.15(e) creates a presumption that counsel failed to comply with the rule. Where counsel determines that filing an amended motion is not warranted, counsel should make that determination a part of the record. At such time as the motion court may proceed to rule a postconviction motion and there is no record of any activity by counsel on movant's behalf, the motion court shall make inquiry, sua sponte , regarding the performances of both movant and counsel. If counsel's apparent inattention results from movant's negligence or intentional failure to act, movant is entitled to no relief other than that which may be afforded upon the pro se motion. If the court determines, on the other hand, that counsel has failed to act on behalf of the movant, the court shall appoint new counsel, allowing time to amend the pro se motion, if necessary, as permitted under Rule 29.15(f).
Luleff , 807 S.W.2d at 498. Under Luleff , therefore, the record before the circuit court must affirmatively indicate that appointed counsel has complied with Rule 29.15(e).[4]
Generally, a circuit court is not required to perform an independent inquiry under Luleff if appointed counsel does either of the following: (a) counsel files a timely amended motion on the movant's behalf; or (b) counsel files the statement contemplated by Rule 29.15(e), explaining the actions counsel undertook to determine whether an amended motion was required. See , e.g. , Moore v. State , 458 S.W.3d 822, 825 (Mo. banc 2015) ; Vogl v. State , 437 S.W.3d 218, 229 (Mo. banc 2014) ; Stanley v. State , 420 S.W.3d 532, 541-42 (Mo. banc 2014).
A Luleff inquiry may be required, however, "[e]ven though the record may reflect some activity by appointed counsel to demonstrate compliance with Rule 29.15(e)." Poe v. State , 820 S.W.2d 325, 327 (Mo. App. W.D. 1991) (emphasis added). For example, the Supreme Court has held that abandonment may be found even though counsel files a Rule 29.15(e) statement, if that statement fails to establish that counsel engaged in the level of activity required by the Rule. In Moore v. State , 934 S.W.2d 289 (Mo. banc 1996), appointed counsel in a guilty-plea case filed a statement in lieu of an amended motion, stating that
he had reviewed the file "with the exclusion of the transcripts of the guilty plea hearing ..., the sentencing hearing ..., and movant's pro se motion...." [Emphasis added.] On the basis of this "review," post-conviction counsel determined that "no additional facts or grounds can be added in an amended motion."
Id. at 290.
Counsel's statement in Moore plainly indicated that counsel had engaged in some action to fulfill his obligations under the rules. The Supreme Court nevertheless *611 held that counsel had essentially conceded abandonment, by acknowledging that he had failed to review essential parts of the record:
Rule 24.035(e) [ (which is identically worded to Rule 29.15(e)) ] requires counsel to "ascertain whether sufficient facts supporting the grounds are asserted in the motion and whether the movant has included all grounds known to him as a basis for attacking the judgment and sentence." In [this] case, the statement filed by post-conviction counsel shows on its face that counsel took neither of the two actions required by Rule 24.035(e). On its face , counsel's statement is thus tantamount to a confession of abandonment. A ... hearing is warranted ... precisely because the face of the record raises the presumption of abandonment to which Luleff ... refer[s].
Id. at 292 ; accord , Brown v. State , 968 S.W.2d 725, 727 (Mo. App. E.D. 1998) (reversing for Luleff inquiry where counsel's statement in lieu of an amended motion indicated that counsel had not communicated with the movant as part of counsel's determination that an amended motion was unnecessary). Other cases reach the same result as Moore , holding that an abandonment inquiry is required even though counsel took some action on a movant's behalf.[5] And the Missouri Supreme Court continues to cite Moore as good law concerning the abandonment doctrine. See , e.g. , Barton v. State , 486 S.W.3d 332, 338 (Mo. banc 2016) ; Moore , 458 S.W.3d at 825 ; Vogl , 437 S.W.3d at 228-29.
The majority opinion cannot be reconciled with the result reached in Moore and related cases. If the majority opinion were correct, each of those cases should have rejected the movant's abandonment claim, for the simple reason that counsel did something to represent the movant-however limited or incompetent. But the courts took the opposite approach, and assessed whether the record of counsel's actions was sufficient to indicate that counsel had, in fact, discharged his duties under Rule 29.15(e).
Of more significance, the Missouri Supreme Court has expressly held that the mere fact that counsel files a paper denominated an "amended motion" is insufficient, standing alone, to make a Luleff inquiry unnecessary. Instead, the Court has explained that "[a]n amended motion ... has been deemed a nullity"-thus triggering the obligation to perform a Luleff inquiry-"when counsel merely replicated a facially deficient pro se motion." Stanley , 420 S.W.3d at 542 (citing Pope v. State , 87 S.W.3d 425, 427-29 (Mo. App. W.D. 2002) ). We have explained that, "when counsel files an amended motion that is so patently defective that it amounts to a nullity, ... counsel, in essence, has not filed an amended motion, and, therefore, the action falls within the first situation of abandonment recognized by the Supreme Court" (namely, cases in which counsel "takes no action" on the movant's behalf). Dudley v.State , 254 S.W.3d 109, 111 (Mo. App. W.D. 2008) ; see also Williams v. State , 415 S.W.3d 764, 768 (Mo. App. W.D. 2013).
*612 The Supreme Court found that "[t]he first amended motion was not a nullity" in Stanley , 420 S.W.3d at 542 ; but it reached this conclusion only after actually examining the modifications the amended motion made to the movant's pro se motion. The Court explained:
The pro se motion alleges only (1) that the plea court failed to reject his plea agreement in "open court" and (2) that Mr. Stanley's plea counsel was ineffective because she promised Mr. Stanley he would receive a maximum of a three-year sentence if he pleaded guilty, yet she allowed the court to treat the plea agreement as a nonbinding "open plea." The first amended motion alleges five claims. It alleges two claims that the plea court erred in failing to tell Mr. Stanley it was rejecting his guilty plea agreement and in failing to allow him to withdraw his guilty pleas, and it alleges three separate claims that his plea counsel was ineffective. The first amended motion also states, as additional facts, that the plea court did not allow Mr. Stanley to withdraw his guilty pleas, that counsel failed to assert in the written plea agreement that the two three-year sentences were to be served concurrently, and that plea counsel did not object or inquire into the plea court's imposition of the maximum eight-year sentence.
The first post-conviction counsel's actions did not constitute abandonment because his filing of an amended motion discharged his duties under Rule 24.035(e). Moreover, the allegations of additional claims and facts in the first amended motion show that Mr. Stanley's first post-conviction counsel made some effort to "ascertain whether sufficient facts supporting the claims" were asserted in the pro se motion and "whether the movant had included all claims known to the movant as a basis for attacking the judgment and sentence." Rule 24.035(e); see Luleff , 807 S.W.2d at 497.
Id. at 542-43.
If the majority opinion were correct that the filing of any document denominated an "amended motion" is enough to defeat the need for a Luleff inquiry, the Supreme Court's detailed comparison of the pro se and amended motions in Stanley would have been unnecessary. But the Supreme Court engaged in that detailed comparison, as part of its determination that the movant had not been abandoned by counsel. Without an explicit statement from the Supreme Court to the contrary, we must presume that Stanley remains good law.[6]
It is also significant that Stanley cited favorably to this Court's decision in Pope -a case the majority now suggests has been overruled by the intervening decision in Barton v. State , 486 S.W.3d 332, 338 (Mo. banc 2016). In Pope , 87 S.W.3d 425, we held that the circuit court was required to perform an independent abandonment inquiry, even though appointed counsel timely filed an amended motion on the movant's behalf. We explained that the "amended" motion in Pope "was a replica of the pro se ... motion, except that the amended motion changed the pronoun 'I' to 'Movant' or 'he' or 'his.' " Id. at 428. We rejected the State's argument that a Luleff inquiry is required "only when appointed counsel takes no action on behalf of movant or files an untimely amended motion." Id. Instead, we held that, where counsel *613 makes "no substantial changes" to the movant's pro se motion, and counsel fails to explain the basis for his determination that no revisions were required, the presumption of abandonment arises. Id. at 428-29. We explained:
A record that does not indicate whether appointed counsel made the determinations required by Rule 24.035(e) creates a presumption that counsel failed to comply with the rule. Based on the fact that Pope's amended motion merely replicated his pro se motion, we are unable to determine whether appointed counsel determined the motion was sufficiently supported by facts and included all claims known to Pope. If no substantial changes were required, appointed counsel should have filed a statement explaining what actions were taken to ensure the sufficiency and completeness of the motion. The minor pronoun changes in the amended motion do not allow an inference that appointed counsel complied with the affirmative requirements of Rule 24.035. This is particularly evident given counsel's failure to correct obvious errors in the pro se motion, such as Pope's allegation that he was denied "allocation at sentencing." This misspelling (of the legal term "allocution") was repeated verbatim in the amended motion, suggesting that appointed counsel did nothing more to the pro se pleading than have it retyped.
Id. at 428-29 (citations omitted).
Similarly, in Trehan v. State , 835 S.W.2d 427 (Mo. App. S.D. 1992), the Southern District held that a Luleff inquiry was required where, "[d]espite the flagrant inadequacy of the movant's pro se motion, his appointed counsel simply incorporated the pro se motion, with its blank paragraph 9, into the amended motion and added two additional grounds for relief which the movant now correctly describes as 'uncognizable.' " Id. at 429.
The caselaw discussed above establishes that the need for an independent abandonment inquiry does not evaporate simply because appointed counsel takes some action to represent the movant in the post-conviction proceeding. Instead, the record must affirmatively indicate that appointed counsel has in fact discharged his obligations under Rule 29.15(e) to investigate and analyze whether a pro se motion requires revision or supplementation. As discussed in the following section, the "amended" motion filed by appointed counsel in this case fails to provide any basis to infer that she in fact performed the investigation required by Rule 29.15(e), and a Luleff inquiry was accordingly required.
II.
The "amended" motion filed by Waggoner's appointed counsel in this case is insufficient to establish that counsel in fact discharged her obligations under Rule 29.15(e) to determine the adequacy of Waggoner's pro se motion following a reasonable investigation.
The 50-page "amended" motion, which is appended to this opinion, consists of a photocopy of Waggoner's pro se motion, on which counsel has made a grand total of 10 handwritten insertions, and added one typewritten general statement.[7] Because it is simply a photocopy (complete with the original file-stamp and signature), the "amended" motion retains the many misspellings in the pro se motion: for example, "Missouri" is spelled "Missorri"; "judgment"
*614 is "judgement"; "counsel" is "council"; "during" is "durring"; and "essential" is "esential." Counsel's failure to correct these obvious errors raises concerns as to whether counsel made the independent inquiry that is required under the Rule. See Pope , 87 S.W.3d at 429 (failure of record to show counsel's discharge of obligations under Rule 24.035(e) "is particularly evident given counsel's failure to correct obvious errors in the pro se motion," such as misspellings).
In addition, counsel retained all thirty-two claims from Waggoner's pro se motion, without any substantive modification. Among other things, Waggoner's pro se motion alleges: that the prosecution had committed the "felony offense of witness tampering" by threatening witnesses and asking them to perjure themselves; that a prosecutor had committed perjury by drafting and filing a false probable-cause affidavit; that the prosecution had forged business records affidavits and the transcripts of two 9-1-1 calls; that Sheriff's Department personnel presented inadmissible evidence to the jury, and improperly discussed the case with jurors, during their deliberations; that Sheriff's Department personnel instructed the jury how to complete the verdict forms; that "rampant judicial misconduct" and "jury misconduct" had occurred; and that the court had failed to maintain an accurate and complete trial transcript by holding discussions off the record, and omitting or altering the record of proceedings. The motion alleges generally that Waggoner's prosecution was plagued by "[r]ampant perjury, forgery, manufacture of false evidence, lying as to where evidence was found, even taking false photo's [sic] at another ... location claiming they were taken at the scene of the alleged crimes." The motion also alleged that there was insufficient evidence to support Waggoner's conviction, that the offense of which Waggoner was convicted was different from the offenses charged in the First Amended Information, and various claims of instructional error.
Certain of the claims asserted in Waggoner's pro se motion (such as challenges to the sufficiency of the evidence to support his conviction; claims of instructional error; and claims of a variance between the charging instrument and the evidence at trial) are plainly claims that could-and should-have been raised in Waggoner's direct appeal. Those claims are not properly asserted in a motion for post-conviction relief, yet counsel retained them verbatim , and without any attempt to justify consideration of those claims in a post-conviction relief proceeding. Many of the other claims Waggoner asserted (such as claims of witness tampering; suborning perjury; forgery of documents; interference in jury deliberations; alteration of the trial transcript; "rampant judicial misconduct" and juror misconduct; and "[r]ampant perjury, forgery, [and] manufacture of false evidence") are factually extravagant. Counsel retained all of those claims in Waggoner's "amended" motion, without reciting a single additional fact or legal authority, and without any indication that counsel had herself determined that a good-faith factual and legal basis actually existed for the claims. It is significant in this regard that the circuit court initially dismissed all of the claims in Waggoner's pro se motion as frivolous-yet appointed counsel later repeated all of those same claims, with no substantive revision or supplementation.[8]
The two most "significant" revisions made by appointed counsel were the addition *615 of a preliminary statement to Waggoner's pro se motion, and the explicit identification in seven instances of witnesses who would support various claims. But neither of those revisions is sufficient to demonstrate that counsel discharged her obligations under Rule 29.15(e). The preliminary statement counsel added is merely a vague claim that Waggoner was denied his right to a fair trial, a fair and impartial jury, and due process of law.[9] The statement is so generic that it could be used to introduce the post-conviction claims of any movant, in any post-conviction case. It does not support any inference that counsel in fact investigated the circumstances of Waggoner's case.
Counsel's identification of witnesses is no more meaningful. In each case in which a witness was explicitly identified by counsel, the identity of that witness was already readily apparent from the claim description contained in Waggoner's pro se motion. For example, one of Waggoner's claims was that the State had failed to disclose pending criminal charges against his wife, Samantha Waggoner. Waggoner's description of the claim stated that the State had failed to disclose criminal charges pending against its "key witness," and explicitly stated that, among other things, "Waggoner will rely on the criminal complaint filed in the records of the court in State v. Samantha Waggoner." Thus, it was obvious from Waggoner's pro se motion that Ms. Waggoner was the "key witness" whose pending criminal prosecution was purportedly concealed. Counsel added to Waggoner's description the additional statement that Waggoner "will rely on testimony of 'key witness' referenced above, who is Samantha Waggoner of New Mexico." Counsel's insertion added nothing of substance to Waggoner's motion.
Similarly, in three instances where Waggoner's description contended that the Sheriff had improperly tampered with the jury during their deliberations, counsel added the identical statement that Waggoner "[w]ill rely on testimony of Sheriff Tom Parks and jurors." Notably, counsel's insertion does not identify any juror by name, suggesting that counsel had not actually conducted any investigation of Waggoner's incendiary claim that the Sheriff had actively, repeatedly and improperly interfered with the jury's deliberations.
Finally, counsel added a general statement at the end of the motion, indicating that Waggoner would "rely on his own testimony in support of all of the foregoing claims." This statement is so vague as to be essentially meaningless. In addition, it is hard to believe that Waggoner would in fact have any meaningful testimony to offer concerning many of the thirty-two claims asserted in his amended motion (such as claims of jury or witness tampering, or other claims of prosecutorial or judicial misconduct). This final insertion, once again, provides no basis to conclude that counsel had in fact discharged her obligations under Rule 29.15(e).
In its Brief, the State contends that counsel's identification of witnesses in the amended motion "shows that counsel did investigate appellant's case." I disagree. While counsel's insertions may indicate that counsel had reviewed the pro se motion itself, they do nothing to suggest that counsel conducted any further investigation or review. Moreover, although the majority *616 contends that counsel's addition of witness descriptions into the motion-with respect to only 6 of Waggoner's 32 claims-constitutes an effort by counsel to bring Waggoner's motion into compliance with the procedural requirements of the Supreme Court Rules, counsel's handwritten insertions do not even satisfy the minimal formal requirements of Item #9 of Form 40, which requires that witnesses be identified by name, and address, with respect to each claim asserted in a post-conviction relief motion.
Finally, counsel's correction of the date of the direct-appeal mandate, and addition of the direct-appeal docket number, to Waggoner's pro se motion does nothing to indicate that counsel performed the type of investigation required by Rule 29.15(e).
Despite the majority's determined effort to magnify the extent of appointed counsel's revisions to Waggoner's pro se motion, those revisions are merely cosmetic-the proverbial "lipstick on a pig." Because the record "does not indicate whether appointed counsel made the determinations required by Rule 29.15(e)," a presumption arises that counsel failed to comply with the rule, and the circuit court was required to make an independent inquiry as to whether counsel had, in fact discharged her obligations under Rule 29.15(e). Luleff , 807 S.W.2d at 498.[10]
Accordingly, the case should be remanded to the circuit court for the independent inquiry mandated by Luleff . That inquiry need not be formal, or extensive. As the Supreme Court explained in McDaris v. State , 843 S.W.2d 369 (Mo. banc 1992), the Luleff inquiry "may be as formal or informal as the motion court deems necessary to resolve the question of abandonment by counsel, including, but not limited to, a written response and opportunity to reply, a telephone conference call, or a hearing," so long as the inquiry results in "a sufficient record ... to demonstrate on appeal that the motion court's determination of the abandonment issue is not clearly erroneous." Id. at 371 n.1. While it may not impose significant administrative burdens on the court, conducting such an inquiry is essential to the proper functioning of the postconviction relief process.
Conclusion
Because the record before the circuit court failed to indicate that Waggoner's appointed counsel discharged her obligations under Supreme Court Rule 29.15(e), the judgment of the circuit court should be reversed, and the case remanded to the circuit court for the conduct of a Luleff inquiry.
Attachment *617 Instructions - Read Carefully
In order for this motion to receive consideration by the Circuit Court, it shall be in writing (legibly handwritten or typewritten), signed by the movant, and it shall set forth in concise form the answers to each applicable question. If necessary, movant may furnish an answer to a particular question on the reverse side of the page or an additional blank page. Movant shall make it clear to which question any such continued answer refers.
This motion must be filed in the Circuit Court which imposed sentence.
The movant is required to include in this motion every claim known to him/her for vacating, setting aside or correcting the conviction and sentence or it will be waived or abandoned. Be sure to include every claim.
Movant should exercise care to assure that all answers are true and correct.
If the movant is taken in forma pauperis, it shall include an affidavit setting forth information that establishes that movant will be unable to pay costs of the proceedings. When the motion is completed, the original and two copies shall be mailed to the Clerk of the Circuit Court from which to movant was sentenced.
*618 *619 *620 *621 *622 8. Claims for Postconviction Relief:
Movant was denied his constitutional rights to due process of law, a fair and impartial jury, and a fair trial, contrary to constitutional guarantees under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and under Article I, Sections 10, 18(a) and 22(a) of the Missouri Constitution, because:
*623 ADDITIONAL ANSWERS FOR QUESTION 8 PAGE 2
(a). JUDICIAL ERROR AS JUDGE BY NOT READING INFORMATION AND RELYING SOLELY ON PROPOSED INSTRUCTIONS ERRED BY SUBMITTING AN IMPERMISSABLE INSTRUCTION AS A LESSER INCLUDED OFFENSE: The court erred in submitting instruction #6 [exhibiting a weapon] by allowing the state to "choose" to submit the instruction for count II based on the evidence and actions of the separate offensive act charged in count I because the court falsely believed the defendant had been charged twice for "shooting from that vehicle" which was patently false. The state was allowed by said error to submit exhibiting a weapon as a lesser included offense or in the alternative as a completely uncharged offense based on the conduct of defendant related to Count; I when in fact exhibiting is not a lesser included offense of discharging a firearm from a vehicle as charged in count I [which as charged is not an offense of any Missouri statute no less the one cited]. The prosecution even recommended removing the verbiage "as to count II" from the instruction because he is not submitting count II he is choosing to submit the physical act of "discharging a firearm from a vehicle to wit, a Hummer" as cited in count I "on the basis of" the instructions elements for an offense of the statute cited in "count II". At no time does the court ever reference what was actually charged in count II as cited in the Information, nor does the judge ever reference the act "Inside of the residence at 36417 Nickle Road, exhibiting a shotgun, a weapon readily capable of lethal action in the presence of one or more person in an angry or threatening manner" which would be an offense of the statute cited if it were to have ever happened, which the state failed miserably to ever infer it did as the conduct as charged in the information. The conviction cannot stand and must be vacated because the court acted under color of law in allowing a post state's evidence new act to become a new offense of "while outside of the residence at a shooting range located 200 yards north of the residence at 36417 Nickle Road the defendant exhibited a shotgun, a weapon readily capable of lethal use by discharging it, to wit from a Hummer vehicle, in the presence of one or more law enforcement officers, in an angry or threatening manner". Because the jury's verdict as to Instruction number 6 was to determine if this uncharged act occurred, the verdict is a nullity and must be stricken, vacated, and the sentence based on a violation of Count II an act which the jury was never instructed to deliberate and therefore has not, is also in error and must be vacated as a nullity.
(b). LACK OF JURISDICTION OVER UNCHARGED OFFENSES: The court could not submit the uncharged act as another second offense of "exhibiting a shotgun a weapon, at the shooting range some two-hundred yards away from the residence by discharging a shotgun from a vehicle", because this specific act was not charged as an act which if proven would be an offense of some statute also not cited in the information and the court therefore has no jurisdiction over uncharged offenses. The prosecution elected to charge this act as an offense of the unlawful use of weapons statute as a class B felony, but dismissed after the evidence at trial would not even support what it had charged, missing the remaining required elements to make it an offense of the statute as cited in Count I. It is clear from the record the judge believed the defendant had been charged twice for the same act of "shooting from that vehicle". The singular count of unlawful use of a weapon by exhibiting a weapon [Count II] involved exhibiting a *624 shotgun inside of a residence. This in no way resembled the conduct of defendant, evidence, and actions or reactions of the victims relied on by the court to meet the elements of the alleged offense to allow for submission of instruction number six. Nor the prosecution's argument submitted to the jury based on "obviously that might be a shooting range where he shoots ... there was a discharge the deputies were there and they heard it, he was angry and he was making a threat" nor could the jury convict of either act as the act as charged (Count I is not an offense of any statute if it was there would be an awful lot of farmers and hunters in our prisons, and the prosecution offered no evidence of Count II the act of any exhibition of a shotgun loaded or not inside of the residence or of any person witnessing or being a victim of such an exhibition). The court has no jurisdiction over uncharged offenses IE the act of exhibiting anywhere other than the places and times as cited as the statute offending conduct, and therefore the conviction must be vacated as it is not only invalid it is as a matter of law a nullity.
(c.) SHACKLING OF DEFENDANT ON EXTERIOR OF CLOTHING DURRING ENTIRE TRIAL IN PLAIN VIEW OF THE JURY WITHOUT ANY HEARING OR EXPLAINATION, NOR ANY ATTEMPT TO MITIGATE EFFECTS ON JURY INVALIDATED THE VERDICTS: The defendant was painfully shackled at trial while acting pro-se, crippled by the painful torture device, thereby severely prejudiced in the minds of the jury. The verdict is invalidated as mandated by the US Supreme Court decision in Deck v. Missouri and results in an automatic mistrial. This was done to ensure a conviction by the jury and was intentional, planned rigging of a trial. It is also disgusting and must be not only addressed fully, but in the interest of protecting the judicial system must be punished. Automatic mis-trial.
(d.) PROSECUTION FAILED TO DISCLOSE JURROR WAS CRIMINALLY CHARGED BY SAME PROSECUTOR, AND WAS IN PLEA NEGOTIATIONS WITH HIM AT TIME OF TRIAL: Juror Alma Wood was charged with a criminal offense prior to being seated, was known by the prosecution to be charged and out on bond. She was being prosecuted by the same prosecutor, notably she received a sweet plea deal only days after returning the guilty verdict as to the uncharged act/offense. As if rigging the trial as cited in point "c." was not enough, this again is disgusting behavior which deserves punishment. The state bears all burden of proving the juror was not tampered.
(e.) PROSECUTION FAILED TO DISCLOSE KEY WITNESS WAS BEING CHARGED WITH CRIME WHICH PROVIDED AN AFFIRMATIVE DEFENSE TO COUNT II AS CHARGED, AND THAT THIS CRIMINAL ACT WOULD HAVE REQUIRED THE COURT TO ISSUE A MANDATORY DEFENSE INSTRUCTION FOR COUNT II AS CHARGED: The imaginary charged offense to threaten the witness to commit perjury [which she refused to do] involved a violent assault of a child inside of the residence by the alleged victim of the exhibition. Missouri law allows one to act in defense of another, including lethal action if required. The jury had an absolute right to hear this information and was required to contemplate the mandatory defense instructions. It further had the right to know the prosecution was willfully falsely accusing others, just as it had done against the defendant. The jury also had the right to contemplate why the witness exercised her right not to testify, to avoid a false prosecution and the threats made against her, and that she had done so on the advice of her appointed council. Obviously the defense had an absolute right to explore the charges, to bring forth any witnesses, and to call the officer who lied as to the probable cause statement used as the basis of arrest. The outcome of trial will always be affected when an affirmative defense is available but the prosecution hides it, had the prosecution not been stealing the legal mail of *625 defendant and hiding it in his office this may have been exposed prior to trial, something he openly admitted to, and was instructed to cease by the trial judge who should have taken action at that time by removing him.
(f.) PROSECUTION COMMITTED FELONY OFFENSE OF WITNESS TAMPERING PRIOR TO AND DURRING TRIAL: Prosecutor threatened witness Samantha Waggoner numerous times, asked her to commit perjury, issued false criminal charges against her [see (e.) above], in effort to secure false testimony, and threatened her not to speak with the public defender representing the defendant at the time or "go to jail and lose your child". This was reported numerous times, and witness made out an affidavit post-trial, again this is disgusting behavior, all in effort to secure first a plea deal, then to secure any conviction the court could falsify by throwing the constitution under the rug.
(g.) PROSECUTION COMMITTED FELONY OFFENSE OF WITNESS TAMPERING PRIOR TO AND DURRING TRIAL: Prosecution by proxy threatened minor child witness H.A.N.B. by threatening if he and witness Samantha Waggoner "did not back him up on this" the child would be sent away and never see his mother again. (See (h.) below).
(h.) PROSECUTION FAILED TO DISCLOSE WITNESS SAMANTHA WAGGONER HAD DECLARED DEFENDANT WAS INNOCENT OF ALL CHARGES, PROSECUTOR WAS LYING, THAT SHE HAD DISCOVERED HE HAD WRITTEN THE PROBABLE CAUSE FOR THE DEFENDANT'S ARREST HIMSELF TO ADD FALSE FACTS AND TO CHARGE KNOWN FALSE CRIMINAL CHARGES IN ORDER TO SECURE A FELONY WARRANT FOR ARREST, HAD COMMITTED PERJURY BY DOING SO, AND FURTHER THAT SHE HAD STATED TO HIM "THE TRUTH WILL COME OUT, I AM NOT GOING TO LIE FOR YOU, YOU ARE JUST TRYING TO DO THIS SO YOU CAN KEEP YOUR JOB AND NOT GO TO JAIL". The prosecutor and officer admitted to the false affidavit scheme and perjury at trial during cross-examination. Witness further disclosed she was threatened she had better back him up on this or she would go to jail and have her child taken away. See (f.) above.
(i.) FORGERY OF BUSINESS RECORDS AFFIDAVIT TO ADMIT INTO EVIDENCE FIRST ILLEGALLY RECORDED TELEPHONE CALL Prosecutor committed the felony criminal act of forgery of a business records affidavit which had been notarized by himself as the public notary as witness to himself taking the statement of a witness who never had appeared before the court, been cross-examined by the defense, and who also had no personal knowledge of the contents of the recordings nor was present when they were made without the recorded party's knowledge or consent.
(j.) FORGERY OF BUSINESS RECORDS AFFIDAVIT TO ADMIT INTO EVIDENCE 911 CALL. Prosecutor committed the felony criminal act of forgery of a second business records affidavit which had been notarized by himself as a public notary as witness to himself taking the statement of a witness who never had appeared before the court, been cross-examined by the defense, and who also had no personal knowledge of the contents of the recordings nor was present when they were made.
(k.) FORGERY OF TRANSCRIPT FIRST ILLEGALLY RECORDED TELEPHONE CALL Prosecutor committed the felony criminal act of forgery of a transcript which had been falsely certified by the circuit court's own court reporter. The court reporter lied as to her identity claiming to be "Katy Sawyer" from "La Plata, *626 Missouri" not Kathryn I. Sawyer the Linn County Circuit Court's Reporter, who is an employee of the party bringing the charges against the defendant and the court trying the case.
(l.) FORGERY OF TRANSCRIPT RECORDED 911 TELEPHONE CALL Prosecutor committed the felony criminal act of forgery of a transcript which had been falsely certified by the circuit court's own court reporter. The court reporter lied as to her identity claiming to be "Katy Sawyer CCR" from "La Plata, Missouri" not Kathryn I. Sawyer the Linn County Circuit Court's Reporter, who is an employee of the party bringing the charges against the defendant.
(m.) IMPROPER ADMISSION OF RECORDED CALLS BY FALSE BUSINESS RECORDS AFFIDAVITS OF UNKNOWN WITNESS, IMPOSSIBLE TO CERTIFY THE CALLS AS AUTHENTIC AND UNALTERED, NOR WHEN OR WHERE THE CALLS WERE RECORDED, OR WHO THE PERSONS BEING RECORDED WERE.
(n.) FAILURE TO HAVE A UNANIMOUS VERDICT BECAUSE INSTRUCTION GIVEN CAN BE USED FOR TWO OR MORE SEPARATE ALLEGED CRIMINAL ACTS AT SEPARATE LOCATIONS AND SEPARATE TIMES INVOLVING SEPARATE FIREARMS, AND SEPARATE VICTIMS. It is impossible to determine which juror found which act or what combination of the two's elements combined into one act might had occurred or at which location, or with what weapon, no less which victims; or if some found one act had occurred but did not believe the other had been proven and some the opposite. It is entirely possible six jurors found the defendant innocent of exhibition of a weapon inside the residence the act charged as an offense, and six found innocence of exhibition during the discharge of a firearm at the shooting range some half-hour later, while others found there was no weapon at all merely an exhibition of a shotgun, without a determination it was being used as a weapon of offensive or defensive combat or how, simply because the instruction is missing any instruction to the jury they must find the firearm was used as a weapon. Some combination of both acts using elements from each the charged act and the uncharged act could have been used, and in fact would have to be, as there is no evidence of a shotgun at the location of the uncharged act, and only evidence of an unloaded dysfunctional shotgun at the charged location inside the residence, there was no victim inside the residence, and further no exhibition occurred there. It is worth noting the appellate court used this same approach to the verdict in their unpublished ramble, using various evidence from multiple places, times, victims, and separate acts to make a single offense. This is refered to as a "patchwork" verdict and notably is no verdict at all according to the very same court. As it was not properly briefed on appeal, they did not address the issue but focused on what statute had been cited, and whether there was sufficient evidence to prove each element, which there was, just not at the same place or time, and issue they refused to address on their own motion.
(o.) THE PROSECUTION AND JURY WAS IMPROPERLY ALLOWED TO ASSEMBLE EVIDENCE REQUIRED TO PROVE THE ESENTIAL ELEMENTS OF THE Multiple possible ACTS SUBMITTED BY PROVING SOME ELEMENTS AS CHARGED IN ONE CRIMINAL ACT AND ADDING OTHERS AS PROVED AT THE SECOND SEPARATE UNCHARGED CRIMINAL ACT. One cannot prove some elements at one location, then swap victims, swap firearms, and rely on actions and evidence that occurred after the first act had ended, and a new act began, all of the elements must be proven at one location and at one time.
*627 (p.) Separate crimes require separate criminal charges, exhibiting any other unidentified weapon at any later time anywhere except "inside the residence" as charged in Count II, requires as a matter of due process that that criminal act be charged by describing each separate act "as nearly as can be done". Violation of Missouri Sct. Rules, and both US and Missouri Constitution. Anew criminal offense begins when the actor has time to cease and reflect on the first action, obviously going outside driving off in a vehicle parking in a field and going to the shooting range, hanging out there for 30 minutes or more then allegedly discharging a firearm, is a second act and a separate second offense. It is illogical to conclude otherwise, just as our high courts have always done in determining when a second chargeable offense can occur, if this were not true all actions involving any crime would be one continuous act and therefore punishable by only one offense and sentence.
(q.) INSUFFICENT EVIDENCE TO SUPPORT THE VERDICT OF THE UNCHARGED OFFENSE AS SUBMITTED AND ARGUED TO THE JURY.
(r.) INSUFFICENT EVIDENCE TO SUPPORT [a hypothetical] VERDICT; CONVICTION AND SENTENCE BASED ON COUNT II AS CHARGED.
(s.) FAILURE TO HAVE THE JURY'S CONCURRENCE AS TO THE SPECIFIC CRIMINAL ACT IT BELIEVED HAD OCCURRED DUE TO PROSECUTION'S FAILURE TO FOLLOW INSTRUCTIONS FOR USE; MAI RULES VIOLATED BY FAILING TO DESCRIBE LOCATION OF ALLEGED CRIME "AS NEARLY AS CAN BE DONE" (RESULTED IN INSTRUCTION BEING SO VAUGE COURT BELIEVED THE INSTRUCTION WAS FOR ANOTHER ACT AS CHARGED IN COUNT I, AND THAT DEFENDANT HAD BEEN CHARGED TWICE FOR THAT SAME ACT AND NEVER CHARGED WITH THE ACTUAL PROPERLY CHARGED ACT AS CITED IN COUNT II OF THE INFORMATION.
(t.) IT IS PHYSICALLY IMPOSSIBLE TO COMMIT CRIMINAL ACT CHARGED IN COUNT II
(u.) EXHIBITION OF EVIDENCE NOT ADMITTED INTO TRIAL TO JURY; AND IMPROPER CONTACT WITH MALE JURORS ON UNESCORTED BREAK OUTSIDE BY OFFICER WITNESSES DISPLAYING SAID EVIDENCE. Deputies showed jurors four firearms belonging to defendant which were not related to alleged crimes and were inadmissible. Officer's statement of "they won't need these he's guilty anyway" tampered jury.
(v.) Sheriff as potential Defense witness to be called up, and principal arresting officer who violated state and federal law by going into another state to make an arrest, knowing the charges and warrant were a forgery, and person who had stolen from defendant's home, was bailiff and in jury room repeatedly, even instructing jurors, and helping them with evidence, if there had been a conviction based on any one of the charged acts cited as an offense, this would obviously mandate a new trial. Once again State bears all burden in proving there was no effect on jury.
(w.) Rampant Judicial Misconduct, failure to have competent impartial judge before and at trial, post-trial hearings.
*628 (x.) Holding "secret" un-announced court hearings to eliminate new-trial hearing witnesses, and public from hearing or worse yet witnessing and press reporting the truth, not only invalidated sentence, but further demands punishment and oversight to prevent it ever happening again. This was intentional disgusting behavior, warranting a full investigation, also seems to be felony crimes in several different ways in multiple acts.
(z.) Appellate council failed to raise points as instructed by client, failed to properly brief main point which is obviously fatal to the alleged conviction.
(aa.) Failure to maintain accurate complete record of trial denies right to appellate and federal review: "holding discussions off the record", cleaning up trial transcripts to remove obvious mistrial evidence and bailiff misconduct, not only prevents proper review mandating new trial, but is also criminal act which offends numerous Missouri Statutes, principally felony forgery. This behavior again is intolerable and a violation of so many rules and Constitutional Rights the Mo. Sct. Needs to initiate new rules, requiring impartial and unannounced court reporters, transcription off site by civilians, and mandatory audio and video recording of all trials, as they do in most other states. When the record itself is half missing or just "cleaned away as instructed by the judge", there is no record; again this would require a new trial had there been any conviction based on any charged act which would offend a cited statute.
(bb.) Sheriff instructing jury what to place on jury forms they don't understand in absence of both parties, over objection of prosecution negates verdict and or sentence.
(cc.) Sheriff taking jurors evidence improperly admitted by the prosecutor's forgery; over his own objection as prosecution, and judge's explanation post-entry of sheriff into jury room where sheriff remained for several minutes alone with jury, of "I think it will be ok" as to prosecution's objection as to proper procedure, screams juror tampering, at the very least requires mis-trial, once again assuming arguendo there had actually been a conviction.
(dd.) Charging additional known false criminal allegations prejudicial to defendant as guilty in the minds of the jury.
(ee.) Rampant perjury, forgery, manufacture of false evidence, lying as to where evidence was found, even taking false photo's at another other location claiming they were taken at the scene of the alleged crimes, denied any possibility of a fair trial, jurors will believe anything they don't know it's all fake, or that an officer of the law will flat out lie on the stand. You cannot have a fair trial when the court is watching them commit felony crimes, knows it's happening, even takes up for them when they do it, if the court is going to violate the law, well just how does one receive a fair trial. And of course all on the record, don't think I would have wanted the press around for new trial hearings either, and I sure would not want the witnesses who would come and say they saw officers stealing or placing evidence, or that they were just flat ass lying, or worse that what had been charged never happened at all, or any of the points raised herein, simply would have required the removal of the entire judicial law enforcement system. Obviously a fair trial could never be held while the judge watches the prosecution commit forgery and perjury, even manufacture of evidence, then takes up for them.
(ff.) Jury misconduct, as instructed to do so by the judge. Behavior that is simply unexplainable. Denied a fair trial, mandates new trial had there actually been a conviction.
(gg.) The uncharged offense is also physically impossible to commit.
*629 ADDITIONAL ANSWERS FOR QUESTION 9 PAGE 2
(a.) The record clearly indicates the trial judge falsely believed the defendant had been charged with three acts which if proven at trial would be offenses of the criminal statutes sited in each count: Count I Unlawful use of a weapon "for shooting from that vehicle"; Count II unlawful use of a weapon "for shooting from that vehicle"; and Count III resisting arrest by the use of or threatening the use of violence. This was of course false.
The defendant was actually not charged with exhibiting a weapon while discharging a firearm from a vehicle but rather charged with three criminal acts each a separate act and each a separate criminal charge made by information in lieu of indictment. For conduct that occurred outside of the residence after the defendant left his residence and after the arrival of law enforcement the prosecution charged in Count I, unlawful use of a weapon for "discharging a firearm from a motor vehicle, to wit a yellow hummer". For conduct that occurred some 30 minutes or more before the arrival of law enforcement, and notably conduct that occurred inside of the residence prior to the conduct alleged in Count I, the prosecution charged in Count II; "unlawful use of a weapon for inside the residence knowingly exhibiting, in the presence of one or more persons, a shotgun, a weapon readily capable of lethal use, in an angry or threatening manner". For conduct that obviously would have had to have occurred after the arrival of law enforcement and therefore also outside of the residence, the prosecution charged in Count III; "resisting arrest by the use of or threatening the use of violence". At the close of the State's evidence and when contemplating the defense's motion to acquit, the record clearly reflects the Court never read the actual information or the conduct which if proven at trial would be an offense of the cited statute for each separate charge, but rather relied solely on the jury instructions provided by the prosecution prior to trial. [TR p.120,4-p.124,11].
The court then falsely advised the prosecution it could choose to submit the instruction for Count II based on the evidence and criminal conduct submitted for Count I; conduct which occurred outside of the residence after the arrival of and in the presence of law enforcement. This however is not the criminal conduct which is the basis of the singular conduct actually charged as an offense related to exhibiting a weapon, the conduct for which the court now claims a conviction was obtained. That conduct was charged as conduct occurring "inside of the residence in the presence of one or more persons knowingly exhibiting a shotgun".
This new uncharged criminal conduct which the prosecution elected not to charge as a separate offense by including a count IV or a charge in the alternative of Count I, is based on the defendant's additional uncharged acts that allegedly occurred while in or around a vehicle some 200 yards away from the residence and some half hour or more later in time, in the presence of law enforcement not persons inside of the residence. Thus this is an uncharged offense and is a completely second separate act, which the prosecution elected not to include in its three allegations of conduct which if proven would be three separate offenses of criminal statute.
*630 The basis of meeting the burden of proof to allow submission to the jury was that an exhibition had occurred at the vehicle at the shooting range, a second and separate criminal act of discharging a firearm, some minimum of thirty minutes after and some two-hundred yards away from the act alleged in Count II the sole exhibition of a weapon charge cited in the information, which as charged occurred inside of the residence in the presence of persons inside of the residence. This however was not the basis for Count II as submitted to the jury and as concluded by the court knowingly exhibited a shotgun "for shooting from that vehicle". The court explained "You cannot charge him with two separate offenses for shooting from that vehicle can you? You either get one or the other." The problem here which negates the verdict in its entirety is the prosecution had in fact not charged any conduct or offense related to exhibition of any weapon at any other place except "inside of the residence"; specifically not during a discharge of a weapon in the presence of law enforcement. The prosecution tried to explain this judicial error and misconception to the judge, he however became aggravated and continued to falsely believe that based on his interpretation of the instruction which contained insufficient information to determine where the alleged conduct had occurred, the prosecution had improperly charged twice for the same conduct by charging exhibited a shotgun while shooting from that vehicle". The judge believed the act of discharging the firearm was improperly charged as two separate offenses for the same conduct again this was false. The primarily occurs based on the fact the prosecution miserably failed to present any evidence of an exhibition of any weapon inside of the residence, then abandoned any hope of proceeding with that theory. When asked as to meeting the proof elements the judge "asked are you relying on this on shooting from that vehicle?" The judge proves this for us by his statement of "Do you agree that you only get Count I or Count II? You don't get both?" It can be no clearer from the record the judge believes these two counts are based on a single criminal act of discharging a firearm from a vehicle while outside of the residence some 200 yards away after the arrival of law enforcement. This of course is again false, and is clearly refuted by the record as well as the actual text of the information, which clearly charges two separate acts as separate offenses one inside the residence involving a shotgun Count II, and another outside involving a undescribed firearm discharged from a vehicle Count I. (see amended information p.1-2). The court by failing to read the actual criminal conduct as charged in the information, or for that matter the information at all; in complete error and denial of fact allowed the prosecution to "choose" to submit the instruction for count II, for the conduct alleged as an offense in count I. The instruction No. 6 to be used for Count II is so lacking in detail as to be in violation of the notes on use of The MAI. The instruction contains insufficient details as to location as to raise serious double jeopardy concerns, thus once again adding to the problem. The court concluded in error the basis of the submission would be the actions of the defendant during the time and at the place of the conduct alleged not in count II but rather the conduct already alleged as another offense in Count I, this is of course impossible as there had been no charge of exhibiting a weapon at this location and time but rather the conduct was charged as discharging a firearm.
The court was misled by the lack of evidence of what the prosecution elected to charge, conduct which was mere imagination without basis, just as the resisting arrest charge. The record is very clear there was no evidence of any exhibition of any weapon inside the residence, the prosecution *631 could not base any submission of count II on the exhibition of a shotgun inside of the residence, as there was no testimony by any witness related to any such exhibition, the state had no weapon readily capable of lethal use, and could not place any weapon in the hand of the defendant anywhere inside of the residence, nor was there any testimony of him being angry or threatening anyone with anything, no less doing it knowingly in the presence a person or some other person. The prosecution could not proceed with what it had charged in Count II, this resulted in the Judge assuming based on the prosecutions responses that the basis of the instruction had to be for conduct other than that which was charged by the prosecution. The court was far off base in believing the prosecution had erred in making two counts as two offenses for the same conduct, both occurring outside of the residence. It is apparent the court never read what conduct or action which would be an offense of statute if proven was actually cited in count II. The court was blind to the fact there had been no charge of exhibiting a shotgun "for shooting from that vehicle" anywhere outside of the residence, certainly not anywhere near a shooting range some 1/8 mile away from the residence; and certainly not after the arrival of law enforcement, when the defendant by the state's own evidence clearly was not inside of the residence or in the presence any longer of the alleged victims inside of the residence as cited in Count II. The court was unaware the defendant as charged had obviously started anew with a completely new act or conduct which would be charged by the prosecution as Count I.
The Court and prosecution ultimately based its submission of an instruction for exhibiting a weapon on, a completely new uncharged theory of criminal conduct of exhibiting a weapon "while shooting from that vehicle" made possible by the Court's ignorance of what was actually charged in Count II, Exhibiting a shotgun a weapon readily capable of lethal use "inside of the residence". The prosecution tried to alert the Court of the problem, but the judge simply cut him off in mid-sentence, then ignored his and the defendant's attempts to correct him, what he and the defendant are trying to say "I figured they were different elements" "You cannot put me at that scene or with a weapon" [TR120, 17-18]. This is completely different criminal conduct or action
, thus a different offense, on that has not been charged. The Defendant's statement of "I figured that was a different offense" seems to have not been caught by the reporter, however as it was made simultaneously with the prosecution, while the judge would not stop with his incessant overbearing rant, and as the judge interrupts repeatedly mid-sentence to both parties, it is possible she just did not hear it. Again the confusion appears when the judge refers to not the Counts and the criminal conduct as charged, but as "Instruction II", then he actually sustains acquittal of Count II because the prosecution cannot meet the burden of proof as charged. He then says "I know that I'm still contemplating". The discussion then turns again to "choosing" between count I as a B felony offense or "submitting on the basis of instruction II" "the D felony"; this is again irrational as if the burden of proof had been met to allow either offense to be submitted, then both offenses could have been submitted to the jury, the state can submit each separate act of conduct which is an offense separate by time and distance completely unrelated allegedly committed more than 30 minutes apart, some two-hundred yards apart, involving different firearms, and different victims. To do so it must prove the conduct which offends the statute occurred as charged and where charged *632 at the time charged. Here that simply did not occur, the prosecution failed to prove either conduct, and further failed to prove the third conduct of resisting arrest when the officer plain out said he didn't try to arrest anyone. There is no choice to be made by the prosecution, the proper choice is to be made by the court, either submission or acquittal, based on the criminal conduct as charged, and by weighing the evidence presented to prove the specific CONDUCT alleged that was offensive to the statutes every element. Again the prosecution tries to remedy the problem and explains "Well on the record I'm obviously dismissing Count I and I believe" at which point the prosecution is again simply cut off mid-sentence as the judge in denial of fact refuses to allow the dismissing but instructs he must make a choice to submit the instruction for exhibiting a weapon based on the criminal conduct alleged in Count I, or as a choice; submit the instruction for count I for the criminal conduct charged as an offense in count I. [TR128, 13-25]. The prosecution now is certain he is submitting some unknown Count to the jury by choosing to submit the conduct alleged in Count I, and "choosing" to do so by submitting the instruction for the statute elements found in Count II. The prosecution becomes so disheveled the judge even helps with the instructions. The prosecution has no idea what is going on or what is to be submitted, he even offers to remove "as to count II" from the instruction altogether and just replace it with "If you find and believe" by correcting the MAI to reference no count at all. [TR129, 1-5]. The court never allows the deletion of the text, but rather begins compiling the instructions based on the submissions as previously made by the prosecution.
There is little doubt what is being submitted, the record clearly indicates the judge believes he is submitting an instruction for exhibiting a weapon by discharging a firearm from a vehicle in the presence of law enforcement, he repeatedly references "discharging a firearm" and Shooting from the vehicle", neither of these are any form of the conduct alleged and charged as an offense by the prosecution however, it is an imaginary non-existent offense which was clearly abandoned in favor of the higher Class B felony offense for that conduct when the prosecution elected to charge "discharging a firearm from a vehicle" for the defendants act of "shooting from that vehicle". The Judge actually states on the record "instruction number 6 is the state's verdict director as to count II on the discharging a firearm ..." [TR131, 5-8]. The record is very clear as to what was submitted and argued to the jury, the prosecution makes not a single mention after the close of evidence in opening or closing argument of any evidence or testimony even related to the conduct alleged in count II, exhibiting a shotgun inside of the residence , not a single word. The prosecution does however base its entire Theory and arguments on the exact conduct and evidence of Count I with a new theory of exhibiting a weapon by discharging a shotgun from the shooting range because the deputies were shinning their lights at him and he was making a threat, that after the defendant left in a hummer vehicle he went to the shooting range where officers then shined lights at him and he then discharged a firearm and that he was angry and making a statement [emphasis added] . The problem is this is not the conduct charged as an offense the only offense of statute by exhibiting a weapon as cited in Count II which is conduct which occurred inside of a residence some 200 or more yards away before different persons, long before the conduct of discharging a firearm from a vehicle after the arrival and in the presence of law enforcement. This newly formed criminal offense has never been charged, the prosecution elected to charge "discharging a firearm from a motor vehicle" for this conduct, because it in fact could not under Missouri law charge two criminal *633 offenses for the same conduct which occurred at the shooting range outside while discharging a firearm a singular time from a vehicle.
In The mind of the court the information contained Count II as "that outside of the residence at a shooting range 200 yards north of the residence the defendant knowingly exhibited a shotgun, a weapon readily capable of lethal use, by discharging the weapon in the presence of one or more law enforcement officers, in an angry or threatening manner". The problem is this offense simply does not exist anywhere other than in the mind of the Judge, and he ignorantly misinformed, we have to merely read what is charged in each count to determine this to be fact. There simply is no conduct alleged in the information in any of the three counts charged that even resembles this conduct. The court cannot on its own motion create a new offense as a choice to simply make it appear to be tried after the close of evidence. The court after all is not a prosecutor, not a party to the action but a "neutral party". In this case the court has assumed the role of prosecution and is now creating new offenses to be tried, again even if this did not offend every rule of law, it would be simply impossible as a defendant must be advised of the offensive conduct, and given opportunity to council and to defend, not to mention evidence, preliminary hearings, etc. The Constitution simply will not allow such conduct, both state and federal.
In addition the offensive conduct of discharging a firearm was already charged in count I and dismissed, first because it is not an offense of the statute cited, second because the state could not prove any firearm was discharged from any vehicle, no less prove the elements of the offense it intentionally left out to make it appear the conduct was an offense of a B felony charge. The prosecution's statement of "obviously I'm dismissing Count I" was a surrender of any chance of proving what conduct had been charged as an offense. The submission of an uncharged offense by simply choosing at the judges demand to abandon the conduct originally charged, and replace it with some other uncharged conduct {also called criminal actions} which is not a lesser included offense, is simply impermissible.
The simple test of the conviction here is to find what the jury was asked to deliberate, if it is contained in the information and is properly described as the conduct which was offensive, then the conviction stands if not it is a nullity. Here the conduct of of exhibiting a weapon by discharging it in the presence of deputies outside of the residence was never charged anywhere in the information, thus any instruction based on criminal actions never charged, and never cited as an offense of the statute in the information is invalid. Our courts have always upheld the obvious axiomatic standard of "The Court has no jurisdiction over uncharged offenses". The elements to be submitted to the jury by instruction must be based on the conduct which is cited in the information related to the offense of the statute cited in that count and that count alone. The court cannot simply move statutes around to become offenses based on conduct charged as some other statute offense, and this is a poster child example of just that. One cannot charge DWI, and then instruct on bank robbery. The error here is plain and obvious to any novice; the conviction is null and void because there has been noting charged or tried to convict upon.
*634 Even assuming arguendo the court could have submitted the second uncharged offense, the notes on use of MAI absolutely require that when evidence of two or more separate offenses is presented the time and place of the offense should be adequately described. This is true because the defendant must know what conduct is alleged to have been an offense . Due Process requires this mandatory place and time of each offense charged. The Court clearly erred in assuming the prosecution had actually charged two offenses for the same criminal conduct occurring during the discharge of a firearm from a vehicle outside of the residence. Where distinction of multiple offenses by time is not possible, the MAI-CR 3d directs that "the instruction should be modified by the Court to identify the occurrence by some other reference." MAI-CR 3d 304.02, Notes on Use 4(c). The Notes on Use go on to specify:
The place of the offense may become of "decisive importance " under certain circumstances, such as... where the defendant may have committed several separate offenses ... at the same general location within a short space of time.
In such a situation, upon request of the defendant or on the Court's own motion, the place should be more definitely identified, such as "the front bedroom on the second floor," "the southeast corner of the basement," etc.
Obviously this ugly situation has reared its head before and the higher court decided there was need in instructing on such a situation, it cannot be made any clearer what they intended.
The Basic procedural rules related to a criminal information also require the place and time of the offensive conduct be described as nearly as can be done, something the prosecution was required to and did do by including "inside of the residence", and "from a vehicle outside of the residence" and terms like "firearm" and "shotgun" clearly designed to separate two similar criminal actions occurring in separate places and separate times, each separate criminal conduct which could be punished by separate penalties as separate offenses of statute law. The Court was correct in noting "you cannot charge him twice for shooting from that vehicle can you?" It is this requirement of law which the Prosecution properly followed in charging Count I and Count II, each separated by the location and specific conduct which was alleged to have been an offense "inside the residence" as opposed to "from a motor vehicle"; and "Discharged a firearm" as opposed to "knowingly exhibited a shotgun, a weapon".
So to state the obvious; the Prosecution did not charge "outside of the residence some 200yards north at a shooting range, the defendant Knowingly exhibited a Shotgun, a weapon readily capable of lethal use while discharging a firearm in the presence of law enforcement officers, in an angry or threatening manner ". Without this specific text, and taking into account the text of Count II as written on the face of the information, the Court could not submit an instruction for any conduct of the defendant related to exhibiting any weapon of any type other than a shotgun, or anywhere other than "inside the residence" at the time and place and in the manor as charged. The court might have believed this conduct of exhibiting a weapon at the shooting range by discharging a firearm was charged; but it was in every respect, absolutely wrong, error is obvious, here it can be *635 vacation, or by correcting the record to remove the verdict and sentence as a nullity. It goes without saying the defendant had no idea he was being tried for exhibiting a shotgun from a motor vehicle by the shooting range and that this theory of criminal conduct was never advanced by the prosecution during trial, nor defended against by the defense, as this specific criminal conduct was never tried, nor charged until after the close of all evidence, due process, as well as constitutional rule prohibits any conviction based on this untried criminal conduct. "It is axiomatic that a conviction upon a charge not made or upon a charge not tried constitutes a denial of due process." State v. Miller, 372 S.W.3d 455, 467 (Mo. banc 2012) (citing Jackson v. Virginia, 443 U.S. 307, 314, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). And additionally even if one concludes arguendo the Court could submit based on the charged conduct, "An instruction that allows [the jury] to convict of that act or another which is not charged cannot stand." Miller, 372 S.W.3d at 467 (citing State v. Pope, 733 S.W.2d 811, 812 (Mo. App., W.D. 1987)). Other case law supporting this point is cited below:
"Due process requires that a defendant cannot be charged with one offense and be convicted of another." State v. Brown, 950 S.W.2d 930, 931 (Mo.App.1997). IE: can't be charged with hitting a man, and be convicted of spitting on a woman.
"It is elementary law that an accused cannot be charged with one offense and convicted of another." State v. Gant, 586 S.W.2d 755, 762 (Mo. App., W.D. 1979). IE: cannot be charged with stealing a sheep and convicted of stealing a herd of cows.
See also MAI-CR 3d 304.02, Notes on Use 4(c). See also as to lesser included offenses: Section 556.046 prohibits the action taken in this case,
(b.) The record clearly indicates the prosecution did not charge the criminal conduct or act upon which the instruction was submitted, the verdict was based, and the sentence imposed. The state charged only one form of exhibiting a weapon. For his alleged conduct inside the home before law enforcement arrived, the State charged Mr. Waggoner, under Count II, with:
"Unlawful Use of a Weapon, Class D felony - in that on or about March 26, 2011, inside the residence at 36417 Nickle Rd., in the County of Linn, State of Missouri, the defendant knowingly exhibited in the presence of one or more persons a shotgun, a weapon readily capable of lethal use, in an angry or threatening manner."
This in no way is even related to what was submitted as the basis of instruction 6. The court relied on a separate criminal act of "shooting from that vehicle", the prosecution argued a completely different theory of criminal action than what it had actually charged, that the defendant had exhibited a shotgun while in the area of a hummer vehicle down by the shooting range where he shoots, and that he had discharged the shotgun from this location after driving off in the hummer, and having lights shined at him by deputies while down by the pond. This is obviously not the criminal conduct alleged to have occurred as charged in Count II. It is however *636 a portion of the criminal conduct alleged to have been committed as Count I. Upon the Prosecution dismissing this count I, the court simply allowed the accused to stand trial again for the same conduct, this is also a violation of double jeopardy. The location of the alleged conduct has simply been removed to allow for the submission of different criminal conduct at a separate location, by removal of the location of the conduct as charged "inside of the residence at 36417 Nickle Road". Obviously one cannot be outside and exhibit a weapon inside, obviously one cannot submit proof of the required element of a weapon readily capable of lethal use, by the discharge of a firearm 200 yards away from and outside of the residence, obviously the element of in the presence of one or more persons cannot be the deputies who were obviously outside of the residence, and obviously none of the other elements which would have had to have occurred inside of the residence could have been related to discharging a firearm from some 200 yards or more away outside. In fact the record clearly indicates the criminal conduct alleged in Count II was never submitted to the jury, nor proven beyond a reasonable doubt. A generic instruction simply stating the county, state, and elements of the crime was submitted to the jury, it was based on the theory the defendant had discharged a shotgun in the presence of the deputies, at a time when the defendant was in the area of a vehicle, down by a pond at a shooting range, outside, at night. This is not count II, this is some new and completely uncharged criminal conduct which did not happen at the time or location of the conduct as charged in Count II "inside of the residence".
The court has no jurisdiction over uncharged criminal conduct, nor over any newly discovered statute offenses related to the conduct as charged. The court could not instruct the jury as to any statute violation of law related to criminal conduct which is not charged in the information with exception of lesser included offenses, which does not apply here as exhibiting a weapon is not a lesser included offense of discharging a firearm from a vehicle [which is not an offense of any Missouri statute at all]. This submission of an uncharged version of criminal conduct for allegedly exhibiting a weapon which occurred in the location and at the time of the conduct as charged in Count I denied the Defendant the right to present a defense or call witnesses on his behalf based upon a defense to this new theory of criminal conduct thus violating the due process clause of the Fourteenth Amendment of The United States Constitution. The submission of this uncharged count also violated Sct. Rule 23.08. Most importantly the court has no jurisdiction over uncharged criminal conduct, and cannot submit any instruction to the jury based on uncharged conduct [IE: exhibiting a weapon by discharging a firearm from a hummer vehicle outside and 200 yards or more away from the residence in the presence of law enforcement], however as the record clearly states that is exactly what occurred in obvious error. The prosecution never charged the alleged conduct of exhibiting a weapon anywhere other than inside of the residence as cited as the offensive conduct alleged in Count II. It could not charge both discharging a firearm from a vehicle, and exhibiting a weapon as related to the separate specific criminal conduct as alleged in Count I; "discharged a firearm from a vehicle to wit a Hummer". There simply is no offense available to choose to submit for exhibiting a weapon while discharging this same weapon in the presence of the deputy while outside while in the vehicle by the shooting range. The court has no jurisdiction over uncharged offenses, the *637 court's belief defendant had been charged two times for the specific separate criminal conduct alleged in Count I "shooting from that vehicle" as stated by the judge was clearly erroneous. Because the prosecution as related to count I elected to albeit improperly charge a class B felony for discharging a firearm from a vehicle to wit a Hummer, and therefore elected not to charge the "Class D felony of exhibited a firearm a weapon readily capable of lethal use, by discharging said firearm approx. 200 yards north of the residence described in count II, from a vehicle, to wit a Hummer in the presence of law enforcement, in an angry or threatening manner", the court lost any and all jurisdiction over any other statute offense related to the specific criminal actions of the defendant at the time and location of Count I. The prosecution chose to confer upon the court by signing a criminal complaint and issuing thereafter an information each offense which the court would have jurisdiction to try on behalf of the county and or State. The fact the judge failed to read the information and therefore did not know what criminal conduct the court had jurisdiction over, does not infer jurisdiction to the court. Any verdict obtained by trying, instructing, or accepting a verdict based on any conduct other than the conduct as charged, that the defendant knowingly exhibited a shotgun a weapon readily capable of lethal use inside of the specifically described residence, is a clear error negating the verdict and sentence. A single exception lies with lesser included offenses that obviously does not apply here as the elements are completely in opposite. The court has no jurisdiction over any such trial or verdict, cannot instruct based on any other actions as an offense, and cannot choose to submit uncharged criminal acts which are not lesser included offenses.
The High Courts of Missouri have made it abundantly clear a verdict based on an uncharged offense [or separate offense based on a new theory of criminal conduct offensive to an uncited statute violation] is not only invalid, it is a nullity. It should also be noted the court is required to immediately dismiss any action over which it lacks jurisdiction, the fact the court did not realize the error until after trial had ended and sentence rendered, does not change the fact the instruction, verdict, and sentence were all void ab inito. There was in fact no defendant present who had been charged with such an offense of "exhibiting a firearm by shooting from a vehicle outside and 200 yards away from a residence at a shooting range". The Court has jurisdiction only over criminal conduct which is alleged in the information, while the defendant may have already been present to defend against the three specific separate acts of criminal conduct as charged, this does not infer the Court gains jurisdiction over him to simply try uncharged conduct, or to instruct based on a completely new never before disclosed theory of similar criminal conduct which would give rise to a second violation of one of the statutes cited in the information. Simply citing a statute in the information does not confer upon the court jurisdiction to try the defendant for every possible act that might be a violation of that statute anywhere anytime. If this were true one would only have to allege "the defendant committed multiple offenses of Statute ####.####, in the past three years ..." obviously this in no way resembles the rules of criminal law. The prosecution charged specific criminal conduct in count II and it could only submit based on that conduct, the court correctly noted "you cannot charge him twice" for the conduct alleged in Count I "shooting from that vehicle can you?" it failed to realize the prosecution had in fact NOT charged two separate offenses related to the discharge *638 of a firearm ["shooting from that vehicle"], but had in fact charged two separate criminal acts separated by time and space, committed after the actor had time to cease one act or offense contemplate his actions and begin anew thus a new and separate act and a new offense one occurring inside of the residence involving exhibiting a shotgun, and the other involving discharging a firearm from a vehicle. Thus the Court falsely believed it had jurisdiction to proceed to try the defendant for this conduct, this was false and in complete error. The court was completely ignorant as to what offensive conduct had actually been charged by the prosecution, it therefore failed to properly deliberate the evidence presented related to the criminal conduct actually charged in Count II, thus failed to properly acquit.
This however does not and cannot correct the inescapable fact the court had no jurisdiction over the uncharged offense of exhibiting a shotgun from a motor vehicle while discharging a firearm in the presence of law enforcement. The state via the county prosecution has never been asked to proceed to trial against any such criminal conduct, and no defendant had been arraigned on such criminal conduct, been advised of his right to council to defend against such an accusation, nor had there been any discovery of evidence. The simple fact is the State has never charged Mr. Waggoner with "knowingly exhibiting a shotgun a weapon readily capable of lethal use, to wit; by discharging a firearm while occupying a vehicle by a shooting range some two-hundred yards away from a residential structure, in the presence of law enforcement officers, in an angry or threatening manner". Without such a charge or something very similar including the time place and circumstances of this second alleged criminal conduct, no court in any state, on any day, of any year will ever have jurisdiction to try Mr. Waggoner for such conduct. The simple inescapable fact is, Mr. Waggoner has never been charged with such conduct as an offense of statute law, therefore any court claiming to have convicted based on such uncharged criminal action is in error, and any such orders, sentences, or declarations, are a nullity. The proper remedy in such a case is correction of the record as a nullity, by declaring the instruction, trial, verdict, and sentence made in error and therefore a nullity. The courts have properly noted, when the court lacks jurisdiction, there is nothing to appeal from, as the entire action is void ab inito.
A conviction based on an offense not properly charged in the charging instrument is a nullity, as the trial court acquires no jurisdiction over non-charged offenses. State v. Smith, 825 S.W.2d 388, 391 (Mo. App. 1992); see also State v. Smith, 742 S.W.2d 198, 200 (Mo. App. 1986) (citing State v. Brooks, 507 S.W.2d 375, 376 (Mo. 1974)). Hence, because the State failed to charge any person, specifically Mr. Waggoner by information with a separate count of unlawful use of a weapon, based on his alleged separate conduct of exhibition of a shotgun at a shooting range some 1/3 mile from his residence in a cow pasture by a pond while in proximity to or occupying a vehicle at night, as argued to the jury and as the only offense given to the jury to deliberate, not the offense as cited in count II; the trial court lacked jurisdiction to enter a conviction thereon, rendering its judgment purporting to convict Waggoner of unlawful use of a weapon under count II a nullity, requiring the judgment of his conviction to be set aside and held for *639 naught. This is further proven by the legislature's intent in forming the separate crimes rule. See State v. Barber, 37 S.W.3d at 403-04 (holding that, in enacting section 571.030.1(4), which makes it an offense for a person to knowingly exhibit, in the presence of one or more persons, any weapon readily capable of lethal use in an angry or threatening manner, the legislature intended to permit a separate conviction for each angry display of a knife in the same fight or transaction ); State v. Morrow, 888 S.W.2d at 392-93 (holding that, in enacting section 571.030.1(3), which makes it an offense for a person to knowingly discharge or shoot a firearm into a dwelling house, the legislature intended to permit a separate conviction for each shot fired into a dwelling house, even if the shots occurred in rapid fire succession ). Hence, there can be no doubt that the legislature intended, pursuant to section 571,030.1(4), that the act of exhibiting a weapon at the shooting range while in a cow pasture and in proximity to a vehicle by the shooting range would support a conviction, in and of itself. Thus, the separate criminal act of allegedly exhibiting a weapon at the shooting range constituted a separate offense from the two weapons offenses with which defendant was charged, Count I-discharging a firearm from a vehicle and Count II-knowingly exhibiting a shotgun inside of his residence, such that the trial court erred, as a matter of due process, and as a matter of law in instructing the jury on a separate second offense of unlawful use of a weapon (section 571.030.1(4) by exhibiting a shotgun at the shooting range 1/3 mile from the residence, while in proximity to a vehicle by the shooting range down by the pond while discharging a firearm from a vehicle; in that a second count of section 571.030.1(4) was not charged in the amended information. See State v. Pope, 733 S.W.2d 811, 813 (Mo. App. 1987) (holding that, "when the [specific criminal] act was specified [in the indictment] ... the jury can convict only on that act[,] [such that an] instruction which allows them to convict of ... another [act] which is not charged cannot stand"). The fact the court falsely believed the defendant had been charged "twice for shooting from that vehicle" and the prosecution failed to correct this false assumption, does not equate to properly charging by a required Count IV or filing an additional criminal complaint as to the second and separate offense of exhibiting a firearm outside at the shooting range while discharging a firearm from a vehicle, or charging two separate offenses related to this conduct involving discharging a firearm from a vehicle in the alternative. Because Defendant was not charged with this second offense the court lacked all jurisdiction, due process forbids jury deliberation, and any alleged conviction is simply a nullity. The court must correct the record as there is simply no conviction from which to appeal, and no conviction to be set aside. It goes without saying the court cannot simply confer upon itself jurisdiction, the Court's actions as to proceeding against any person including Defendant for the uncharged additional criminal conduct of exhibiting by "shooting from that vehicle" was done under the color of law, as the court had no jurisdiction, and the state had made no such charge of criminal action as an offense of statute to be proceeded against. In essence the Court was simply performing a public fictional drama performance, of a fictional enactment of a fictional trial, of a non-existent defendant being tried for a fictional offense. In short the actions of the persons in the courthouse after the decision to acquit, dismiss, and choose not to submit any of the three counts against the defendant, rendered the action of trying an uncharged criminal act which would be a separate and additional offense of statute law, simply a publicly performed mock *640 court, just for the public's entertainment. The alleged conviction based on the Mock Court's actions is not only invalid, it is fictional, and a nullity. Needless to say any sentence based on a nullity is also a nullity. There simply is no way to refute the fact the court had no jurisdiction over uncharged offenses.
Defendant relies on the transcript as filed, as there is no doubt what the court elected to ask the prosecution: to "choose" between; its available and unavailable options to remedy "charging him twice for the same offense of shooting from that vehicle" something the prosecution had not done and something the record clearly refutes. [TR 120-148]
Defendant also relies on case law cited below:
The "separate or several offense rule," which allows a defendant to be convicted of several offenses even though they arise out of the same criminal transaction. State v. Barber, 37 S.W.3d 400, 403 (Mo. App. 2001) (citing Childs, 684 S.W.2d at 510-11, and State v. Murphy, 989 S.W.2d 637, 639 (Mo. App. 1999)). Under this rule, the question, in determining whether a defendant can be convicted of multiple offenses for the same conduct, is not whether the criminal acts in question are part of the same transaction, but "whether in law and fact [the] defendant has committed two separate offenses." State v. Applewhite, 771 S.W.2d at 870-71. Section 556.041 prohibits multiple convictions for included offenses. It follows then, given the separate or several offense rule, that separate offenses, even though arising out of the same criminal transaction, for which there can be multiple convictions, cannot be included offenses, for purposes of section 556.046.1. The basic inquiry in determining whether separate criminal acts, committed in the course of the same "transaction," constitute separate offenses subject to multiple convictions, is whether the legislature intended to punish each individual act State v. Barber, 37 S.W.3d at 403; State v. Morrow, 888 S.W.2d 387, 390 (Mo. App. 1994). In determining whether the legislature intended to permit multiple convictions, a court looks first to the "unit of prosecution" allowed by the statute or statutes under which the defendant was charged. State v. Barber, 37 S.W.3d at 403. If the unit of prosecution it is not apparent from the charging statute or statutes, recourse must be made to Missouri's general cumulative punishment statute, section 556.041. Id.; see also State v. French, 79 S.W.3d 896, 899 (Mo. banc 2002). Moreover, these statutes are designed to punish each individual act of offensive or injurious contact, as each act poses a new and distinct threat of harm. See State v. Barber, 37 S.W.3d at 403-04 (holding that, in enacting section 571.030.1(4), which makes it an offense for a person to knowingly exhibit, in the presence of one or more persons, any weapon readily capable of lethal use in an angry or threatening manner, the legislature intended to permit a separate conviction for each angry display of a knife in the same fight or transaction); State v. Morrow, 888 S.W.2d at 392-93 (holding that, in enacting section 571.030.1(3), which makes it an offense for a person to knowingly discharge or shoot a firearm into a dwelling house, the legislature intended to permit a separate conviction for each shot fired into a dwelling house, even if the shots occurred in rapid fire succession).
*641 (c.) Shackling of the defendant on exterior of clothing during entire trial in plain view of the jury without any hearing or determination of a special state need, nor any attempt to mitigate effects on jury invalidated any verdict or sentence authorized or not. "Thus, where a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation. The State must prove beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained." Chapman v. California, 386 U.S. 18, 24 (1967)."
The defendant was painfully shackled at trial while acting pro-se, crippled by the painful torture device, and severely prejudiced in the minds of the jury. The record does not refute the shackling which was witnessed by each and every person present in the court. Affidavits have been filed describing the shackling which occurred both at guilt phase and punishment phase of the entire trial. At no time was the defendant seen by the jury without shackle. Defendant was crippled unable to properly walk, had to hold the shackle to approach the witnesses and jury, and the irons produced severe pain and inflicted torture, requiring the defendant to hunch over to even walk. The court stated it had no responsibility to ensure the defendant appeared unshackled, that was up to the Sherriff, obviously ignorant as to the decision of Deck v. Missouri or to the basic concept of a fair trial in place since the early 15th century. The verdicts are invalidated as mandated by the US Supreme Court decision in Deck v. Missouri this results in an automatic mistrial. "We first consider whether, as a general matter, the Constitution permits a State to use visible shackles routinely in the guilt phase of a criminal trial. The answer is clear: The law has long forbidden routine use of visible shackles during the guilt phase; it permits a State to shackle a criminal defendant only in the presence of a special need." Deck V. Missouri US 544_ (2004).
There is nothing in the record to even suggest any "state interest or special need" related to the defendant, thus the conviction cannot stand and the verdict is invalid both as to guilt and punishment.
Defendant relies on two affidavits declaring the shackling made by state's witnesses. Defendant also will rely on the testimony of each and every juror as to what they witnessed, the testimony of the sheriff of the county Tom Parks, Deputy Maurice Eskew, each and every states witnesses called to testify, the local news reporter, Public Defender Mrs. Lauren Patterson, Prosecutor Tracy Carlson, and every potential juror summonsed to appear for jury selection, as well as the testimony of former Judge Gary E. Ravens and many other citizens and officials present on the day of trial.
Any person present at trial would have to commit outright perjury to deny the shackling took place, or that it did not continue during the entire trial process. It was horrible and painful and *642 the shackles were traded during recess to prevent loss of blood circulation, and were painful as hell.
The State has argued this point before the US Supreme Court; the State lost miserably and made a fool of themselves, I welcome them to do it again, a picture is worth a thousand it didn't happen lies. The State did however succeed in eliminating any hope someone else would ever be tried in shackles and a verdict be obtained and upheld, they set the rule in play for all courts to follow the High Court's decision of mistrial and guidelines for future trials. It appears the 9th Circuit Court of Linn County, Missouri never got word you simply cannot try criminal defendants in visible restraints, especially painfully crippling them in front of the jury. That's what Federal Courts are for, this issue will most likely be solved once again there.
Waggoner will rely on Deck V. Missouri US 544 (2004) "Thus, the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial."..." shackling is inherently prejudicial. 475 U. S., at 568. That statement is rooted in our belief that the practice will often have negative effects, but like the consequences of compelling a defendant to wear prison clothing or of forcing him to stand trial while medicated those effects cannot be shown from a trial transcript." Riggins, supra, at 137. Thus, where a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation. The State must prove beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained." Chapman v. California, 386 U.S. 18, 24 (1967)."
I will also rely on law as far back as 1643.
(d.) PROSECUTION FAILED TO DISCLOSE JURROR WAS CRIMINALLY CHARGED BY SAME PROSECUTOR, AND WAS IN PLEA NEGOTIATIONS WITH HIM AT TIME OF TRIAL: Juror Alma Wood was charged with a criminal offense prior to being seated, was known by the prosecution to be charged and out on bond. She was being prosecuted by the same prosecutor, notably she received a sweet plea deal only days after returning the guilty verdict as to the uncharged offense.
This point is self-explanatory. Alma Wood a juror was known to be criminally charged by the same prosecutor, was represented by Attorney Terry Tschannen, who after the resignation of Trial Judge Gary E. Ravens was appointed as Judge to the same court. It goes without saying the prosecution had a duty to disclose it was prosecuting a juror at the time of trial, and was going to offer a sweet plea deal just days after trial ended, three to be exact. The state bears all burden in disproving this point, the records of the court are very clear. A simple search of case.net reveals the docket and all the relevant information to prove this fact. As juror tampering is alleged herein this only becomes more of a serious concern.
Waggoner will rely on the court docket, testimony of Juror Alma Wood, and the testimony of Judge Terry Tschannen, as well as Prosecutor Tracy Carlson, and if needed Judge Williams of the *643 associate division court. The jury tampering is alleged in a separate point herein and the evidence relied on in that point will also be relevant to this point.
(e.) PROSECUTION FAILED TO DISCLOSE KEY WITNESS WAS BEING CHARGED WITH CRIME WHICH PROVIDED AN AFFIRMATIVE DEFENSE TO COUNT II AS CHARGED, AND THAT THIS CRIMINAL ACT WOULD HAVE REQUIRED THE COURT TO ISSUE A MANDATORY DEFENSE INSTRUCTION FOR COUNT II AS CHARGED: The charged offense involved a violent assault of a child inside of the residence by the alleged victim of the exhibition, Missouri law allows one to act in defense of another, including lethal action if required. The jury had an absolute right to hear this information and was required to contemplate the mandatory defense instructions.
The fact the criminal charges were levied as threat to the witness to commit perjury or suffer false prosecution and public embarrassment are irrelevant to the failure of the Prosecution to disclose it had charged a witness with a violent assault which would have entitled any person witnessing such an act to defend the child as well as potentially themselves up to and including the use of deadly force. This failure to disclose these charges and that an available officer witness had filed a probable cause stating the assault had occurred inside the home including strangulation of the child and physical assaultive behavior, denied the Defendant the right to examine the witness, expose the falsity of his statement (proven at trial of the witness, as the assault was found to have never occurred at all). This officer would have committed perjury, been caught in his prior perjury in conspiracy with the prosecution, or at the very least provided sufficient evidence that anyone inside of the home was entitled to defend against such an attack. The later would have mandated a defense instruction, the prior would have resulted in the arrest of the officer and prosecution, either of which would have had a profound effect on the jury, and would have definitely affected the outcome of trial, assuming arguendo, that the state had actually submitted the offense in count II as charged. In any event it would have required the jury to inquire as to what the state was claiming had occurred on the evening in question, and definitely affected the credibility of the other officers who were also caught committing perjury as to evidence and as to their actions while at the scene.
Waggoner will rely on the criminal complaint filed in the records of the court in State V. Samantha Waggoner, testimony of Deputy Maurice Eskew, and testimony of prosecutor Tracy Carlson, as well as Judge Gary Ravens who tried the case which resulted in a finding of innocence, and will rely on testimony of "Key witness" referenced above, who is Samantha Waggoner of New Mexico.
(f.) PROSECUTION COMMITTED FELONY OFFENSE OF WITNESS TAMPERING PRIOR TO AND DURRING TRIAL: Prosecutor threatened witness Samantha Waggoner numerous times, asked her to commit perjury, issued false criminal charges against her in effort to secure false testimony, and threatened her not to speak with the public defender representing the defendant at pre-trial actions or "go to jail and lose your child".
*644 Because the statute of limitations has not expired and criminal charges are required a simple affidavit from the witness is to be relied on at the time of hearing on this matter. Witnesses are available as to the Prosecution's statements made in both private and public, and upon request of the court these statements of witnesses can be filed and sealed at the discression of the State's Prosecuting Attorney General or council. Evidence is available as well, and can be disclosed at the discression of the State or Court. The same applies to point (g.) below.
(g.) PROSECUTION COMMITTED FELONY OFFENSE OF WITNESS TAMPERING PRIOR TO AND DURRING TRIAL: Prosecution by proxy threatened minor child witness H.A.N.B. by threatening if he and witness Samantha Waggoner "did not back him up on this" the child would be sent away and never see his mother again. (see (h.) below).
(h.) PROSECUTION FAILED TO DISCLOSE WITNESS SAMANTHA WAGGONER HAD DECLARED DEFENDANT WAS INNOCENT OF ALL CHARGES, PROSECUTOR WAS LYING, THAT SHE HAD DISCOVERED HE HAD WRITTEN THE PROBABLE CAUSE FOR THE DEFENDANT'S ARREST HIMSELF TO ADD FALSE FACTS AND TO CHARGE KNOWN FALSE CRIMINAL CHARGES IN ORDER TO SECURE A FELONY WARRANT FOR ARREST, HAD COMMITTED PERJURY BY DOING SO, AND FURTHER THAT SHE HAD STATED "THE TRUTH WILL COME OUT, I AM NOT GOING TO LIE FOR YOU, YOU ARE JUST TRYING TO DO THIS SO YOU CAN KEEP YOUR JOB AND NOT GO TO JAIL".
The prosecutor and officer O'linger admitted to the false affidavit and perjury at trial during cross-examination. The record clearly indicates the prosecution further wrote the entire officer's statement for him which he then brought to his home for him to endorse. More than 13 facts contained in the probable cause either did not occur at all, or were changed chronologically, or were simply outright lies. The prosecution further admitted he had committed forgery by obtaining a copy of the criminal complaint stamped as filed on the 27th, and then had a notary notarize it on the 28th, he then presented it to the defense as if it were a true copy as filed, and it was not. The true filed copy is not notarized at all, in addition the arrest warrant was never filed with the court at all, in other words there has been no arrest warrant ever issued to arrest the defendant.
The prosecutor on two occasions met with the witness who disclosed to him defendant was actually innocent, in one case publicly arguing with the prosecution as to the fact he was lying, had falsified charges, and she had discovered in order to obtain a conviction or a plea, he had filed known false charges. The prosecution is required to disclose that a witness is declaring prosecutorial misconduct, has committed perjury, and has not only tampered witnesses, but is actively suborning perjury, by threatening criminal charges, or harm to their livelihood and enjoyment if they fail "to back him up" by lying or just keeping their mouths shut. Telling a witness "you and (the minor child) must testify for the state you have no choice in the matter, you will testify as I wish" is outright witness tampering, as is telling the witness to cease all contact with the public defender and the defendant, or you will be charged with witness tampering. The fact he begins to steal the witnesses mail and discloses it with statements of *645 "hoping to charge her with witness tampering" sent to other officials not related to the trial at all is criminal action, admitting to it in court, including stealing "legal mail" directed to the defendant is reprehensible. The Court addressed this problem at pretrial hearing at which time he admitted to being in possession of some 30+ letters including legal mail. I doubt seriously the theft had any effect on the outcome at trial simply because the prosecution failed miserably to prove any of the three counts charged, and only obtained a conviction by illegal means without jurisdiction with the help of or outright approval of the court. As Defendant moved for removal of the Prosecutor and assignment of a special prosecutor, which the court both sustained and dismissed, the State should be directed to address the prosecutorial misconduct and allow the court to determine if this behavior was outcome related. As noted above this is criminal action and needs to be prosecuted. When the prosecution is so set on preventing a fair defense, it leaves little doubt in some way the actions had some effect on trial, but again as there was no conviction the court may find this point moot.
Again the evidence of these offenses will be relied on for multiple points. Witness Samantha Waggoner will be available to the court.
(i.) FORGERY OF BUSINESS RECORDS AFFIDAVIT TO ADMIT INTO EVIDENCE FIRST ILLEGALLY RECORDED TELEPHONE CALL. Prosecutor committed the felony criminal act of forgery of a business records affidavit which had been notarized by himself as a public notary as witness to himself taking the statement of a witness who never had appeared before the court, been cross-examined by the defense, and who also had no personal knowledge of the contents of the recordings nor was present when they were made.
Waggoner relies on the fact under statute law a notary cannot notarize his own documents, he is claiming to be the person verifying he actually took a statement from a witness no one has ever seen, who has never appeared at any point during pre-trial or trial. As a result any such affidavit is a nullity, invalid in all respects. The fact his own signature appears to be a forgery written by the hand of another which exactly matches the style and form of the witness's signature is somewhat perplexing, in no way does it even resemble the customary signature of the Prosecutor found on every filed document in the record, in fact a simple comparison of the affidavit against any example of his filings is sure to result in a finding he did not execute his own signature as notary. The business records affidavits are contained in the record as well as at least a dozen comparisons. The Prosecution admitted to notarizing the affidavits upon objection to their introduction at trial, the court reasoned "YOU NOTARIZED THIS? ... it's not his signature you need to be worried about it is hers" quickly overruling the objection. The court plainly erred in admitting the evidence without an authentic and properly executed business records affidavit. A statement made by the prosecution, for the prosecution, to the prosecution, witnessed by the Prosecution as notary, hardly is sufficient to introduce evidence of any kind. Coupled with the fact the court's very own reporter then falsified her certification by pretending she was not employed by the court and was actually someone else living in another place, gives rise to once again criminal charges. This issue of falsifying the certification, then committing felony forgery by presenting them as authentic in a felony trial is raised in separate points herein.
*646 Waggoner relies on the business records affidavits, an example signature of Tracy Carlson, and the trial transcript, wherein the prosecution admits to the criminal offense. The same evidence shall support the point below related to the second recording illegally admitted in error. One can only assume without the recordings the prosecution would have no case at all, how this affects the outcome of trial as there was no conviction related to the three counts this evidence was tried with will have to be determined by the Court. Of course if the evidence was inadmissible, it makes little difference if the defendant is acquitted of all counts, and tried thereafter with a new uncharged offense proposed by the court on its own motion by not understanding the criminal contents of the allegations being charged by the prosecution.
(j.) FORGERY OF BUSINESS RECORDS AFFIDAVIT TO ADMIT INTO EVIDENCE 911 CALL. Prosecutor committed the felony criminal act of forgery of a second business records affidavit which had been notarized by himself as a public notary as witness to himself taking the statement of a witness who never had appeared before the court, been cross-examined by the defense, and who also had no personal knowledge of the contents of the recordings nor was present when they were made. See point (i.) above for evidence relied on.
(k.) FORGERY OF TRANSCRIPT FIRST ILLEGALLY RECORDED TELEPHONE CALL. Prosecutor committed the felony criminal act of forgery of a transcript which had been falsely certified by the circuit court's own court reporter. The court reporter lied as to her identity claiming to be "Katy Sawyer" from "La Plata, Missouri" not Kathryn I. Sawyer the Linn County Circuit Court's Reporter, who is an employee of the party bringing the charges against the defendant.
Waggoner will rely on the transcript certification page, Transcript Cover Page, The business records affidavits, and the testimony of Prosecutor Tracy Carlson, and Kathryn I. Sawyer.
(l.) FORGERY OF TRANSCRIPT RECORDED 911 TELEPHONE CALL. Prosecutor committed the felony criminal act of forgery of a transcript which had been falsely certified by the circuit court's own court reporter. The court reporter lied as to her identity claiming to be "Katy Sawyer CCR" from "La Plata, Missouri" not Kathryn I. Sawyer the Linn County Circuit Court's Reporter, who is an employee of the party bringing the charges against the defendant.
The evidence for point (k.) above will be used to prove this point.
(m.) IMPROPER ADMISSION OF 2 RECORDED CALLS BY FALSE BUSINESS RECORDS AFFIDAVITS OF UNKNOWN WITNESS, IMPOSSIBLE TO CERTIFY THE CALLS AS AUTHENTIC AND UNALTERED, NOR WHEN OR WHERE THE CALLS WERE RECORDED, OR WHO THE PERSONS BEING RECORDED WERE.
*647 This is self-explanatory, without the witness present to verify the authenticity, and completeness of the calls, where they originated and terminated at, and when and where they were recorded and for what purpose, the calls are inadmissible. There simply is no way to determine if the calls have been altered, portions removed, or to determine who made the calls, who had received the calls or to what subjects the calls were intended to be about. There is no indication who is on the first call or who the unidentified caller is describing as "he", there is nothing in the record to indicate the calls are actually authentic, or that they are complete, or that there were no other calls placed or received at the same time, before, or after, without examination of the records keeper there simply is no way of knowing. The defense is entitled to some assurance that the records keeper is actually someone who is familiar with the calls, the time they were made, and that they are in fact complete and true copies of the originals. Here we have an unknown person who appears not to be the records keeper but actually, Corra Hoermann, the Municipal court clerk for Judge James Williams, The same Williams who is actually the associate judge of the very same trial court, very simply there are serious issues with the evidence, without a business records affidavit, the calls were inadmissible, forgery is a serious crime, as is acting as a false notary, in fact they both are a crime, forgery in a felony trial is punishable as a class C felony without benefit of conditional release or parole. The jury definitely had a right to know the state was not only threatening witnesses, committing and suborning perjury, but stealing mail, and falsifying affidavits, as well as asking the court reporter to commit a crime herself, by lying as to her identity and employment related to this very evidence. Throw in the forgery of either one or both signatures of the parties, and well any juror would have some serious doubts, and any defendant would move the evidence be suppressed, just as happened at trial, to which the judge said overruled, even when the prosecutor admitted to a class d felony offense, and was trying his best to commit two or three counts of a class c felony, all on the record clear as day. It is hard to imagine a fair trial before a fair judge under these circumstances. There is no doubt this evidence would have affected the outcome of trial if in fact there had been an additional fourth proper charge of the criminal act of exhibiting a shotgun by firing from that vehicle as was erroneously submitted to the jury.
The evidence to be relied on will be the Business records affidavits, the transcripts of the calls, and any relevant portions of witness testimony or the lack of related to the identity of the callers.
(n.) FAILURE TO HAVE A UNANIMOUS VERDICT BECAUSE INSTRUCTION GIVEN CAN BE USED FOR TWO OR MORE SEPARATE ALLEGED CRIMINAL ACTS AT SEPARATE LOCATIONS AND SEPARATE TIMES INVOLVING SEPARATE FIREARMS, AND SEPARATE VICTIMS. It is impossible to determine which juror found which act had occurred or at which location, or with what weapon, no less to which victims; or if some found one allegation of criminal action had occurred but did not believe the other had been proven and some the opposite. It is entirely possible six jurors found the defendant innocent of exhibition of a weapon inside the residence, and six found innocence of exhibition during the discharge of a firearm at the shooting range some half-hour later, while others found there was no weapon at all merely someone shooting a shotgun in the presence of someone else while angry or as a threat, without a determination it was being used as a weapon of offensive or defensive combat, simply *648 because the instruction is missing any instruction to the jury they must find the firearm was used as a weapon.
Instruction Number 6 submitted to the Jury states:
"As to count II, if you find and believe from the evidence beyond a reasonable doubt: First, that on or about March 26, 2011, in the County of Linn, State of Missouri the defendant exhibited in the presence of one or more persons a shotgun, and Second, that he did so in an angry or threatening manner, and Third, that the shotgun was readily capable of lethal use, and Fourth, that defendant acted knowingly with respect to the facts and conduct submitted in this instruction, then you will find the defendant guilty ..."; You will note there is no requirement the jury deliberate or find beyond a reasonable doubt the shotgun was being used as a weapon. The instruction simply directs the jury if a shotgun was present than it had to be being used as a weapon. The problem is a weapon is defined as "an instrument of offensive or defensive combat", obviously we need not address defensive as this would be fatal for failure to instruct on self-defense, but as to offensive combat, there is no indication of any combat between the officers and whoever could have had a shotgun, there was no contact, no sight of any person, no words exchanged and obviously no person witnessed and facial expressions or body actions, not a single word was ever spoken, and there was absolutely no contact between the parties before or after the alleged exhibition, a weapon is unprovable when you cannot determine what any shotgun is being used for, combat or otherwise. While a shotgun can be a weapon it can also not be a weapon, the state miserably failed to offer any evidence of a weapon being used for some purpose of combat. We have no way of knowing where or if any one juror found the shotgun was a weapon, no less when, or in combat with whom. In fact we have no idea where any alleged act occurred beyond somewhere in Linn County, on the 27th. More importantly we must address the issue of unanimous verdict.
The trial court plainly erred in failing to instruct the jury more specifically as to the particular location of the criminal conduct which it was required to find that Waggoner committed, and thereby denied Waggoner his constitutional right to have unanimous jury concurrence in his guilt. This requires this court reverse his conviction.
At trial the State produced differing accounts of what was being charged in two separate counts of Unlawful use of a weapon which occurred at different times, and in a number of different locations: inside the house where he lived; in a vehicle some 200 yards from the home; at a skeet shooting range; and at a second rifle and pistol shooting range physically separate from the home by some 250 yards located on the 20 acre farm property of the defendant. Given the verdict director, it is impossible to know whether the jury unanimously found beyond a reasonable doubt that any of these specific incidents of Unlawful Use of a Weapon had occurred, and if so, which one (or ones).
In State v. D.W.N., 290 S.W.3d 814 (Mo. App. W.D. 2009) (en banc), the Court recently summarized the law relating to a defendant's right to a unanimous verdict in criminal cases, and the manner in which vague or disjunctive jury submissions may deny a defendant this right:
*649 no more obvious. The record including copies of the information and what was charged simply has not changed, it is correct, the instruction to deliberate based on this uncharged conduct was done purely under color of law, as there was no court or prosecution ever empowered with trying a defendant for said conduct. Once again one can only find the entire effort a nullity.
The court erred in failing to acquit as there simply was no evidence the criminal act that was actually charged in Count II had ever occurred, changing to a new conduct which was uncharged or in this case already charged as another separate offense did not change the necessity of an acquittal. It should be noted the court did acquit count II then elected to change the conduct, thus an acquittal did occur.
The conviction cannot stand and must be vacated. But a conviction cannot be vacated if it is a nullity because it simply does not exist at all. A conviction based on an offense not properly charged in the charging instrument is a nullity. Collins, 154 S.W.3d at 497. Due process requires that a defendant may not be convicted of an offense which is not charged in the indictment or information. State v. Cowles, 203 S.W.3d 303, 307 (Mo. App., S.D. 2006) (citing State v. Smith, 592 S.W.2d 165 (Mo. banc 1979)). Again, the prosecution charged Mr. Waggoner, under Count II, with exhibiting a shotgun inside the residence, but he was convicted under instruction No. 6 (The uncharged offense) for exhibiting some other shotgun outside of the residence by discharging it some two-hundred yards away in the presence of law enforcement officers some 30 minutes or more later after he allegedly drove away in a hummer. The offense submitted to the jury must be based on the same criminal conduct that is alleged in the information. See State v. Collins, 154 S.W.3d at 494 (a jury could not be instructed for an assault that occurred at a different time and place than the conduct alleged in the charging document.)
The origination of a criminal charge is the criminal actions of the accused which if proven at trial violate each and every element of the statute cited which prohibits such conduct and constitutes an offense. Criminal defendants are not charged with crimes, they are naturally charged with having committed a specific act which if proven gives rise to an offense of the statute which thereby confers upon the court the right to proceed and punish the accused upon a finding of guilt by a jury weighing his actions to determine if in fact such actions violated each and every element of the statute. Criminal defendants are not charged with statutes, they are charged with committing some action or act, which if proven beyond a reasonable doubt are an offense of the statute. One simply cannot charge "bank robbery" and then assume this covers every possible bank robbery the defendant committed in the general time frame charged, even if it occurred at any number of separate banks using separate vehicles and weapons, this would limit the state to trying a single offense, eliminating separate punishments for separate criminal conduct altogether. It should be the state not the defendant arguing this point, if the conviction is upheld here the prosecution can only charge once for 10 or 20 separate acts, not exactly what the legislature intended. In short as a matter of law any conviction based not on conduct which was the conduct alleged by the information to have occurred and thus be an offense of statute, "the criminal charge"; but based on conduct related to some other conduct or "charge" which is not described or has already been charged as another offense cannot stand under any circumstance and must be corrected either by *650 The Missouri Constitution provides "[t]hat the right of trial by jury as heretofore enjoyed shall remain inviolate[.]" Mo. Const. art. I, § 22(a). This right to trial by jury includes "all the substantial incidents and consequences that pertain to the right to jury trial at common law." This includes the right to have the jury's unanimous concurrence in the verdict.
Prior cases have held that the submission of multiple separate acts of alleged similar criminal conduct in a single instruction runs afoul of a defendant's constitutional right to a unanimous concurrence in the verdict. This is because an instruction that submits two separate criminal actions in one instruction which can be used for either creates a situation where some of the jurors may have agreed that he was guilty of the offense because he committed one act while the other jurors believed that he was guilty because he committed another act. It is all too clear this is the case here. In addition the instruction fails to define if it was in an angry manner, or if it was in a threatening manner. Both of these propositions were argued at closing and were in serious dispute at trial. Each of the two counts; Count II as charged RSMo 571.030.1(4) and the uncharged act argued and submitted to the jury as ordered by the court 571.030.1(4) were separated by time; and at locations separated by a minimum of 100 and a maximum of 250 yards (300-750 feet), both allegedly involved one of several firearms the state never offered as evidence. The Trial court forced a choice to be made although the record indicates Count III was acquitted and Count I was submitted on the basis of an instruction formerly charged as Count II, as a fourth uncharged act. Here neither Count is contained or represented by the instruction submitted for deliberation. The defective jury instruction is so vague as to allow some jurors to find guilt of Count I as a lesser included offense (although such instruction would be and was illegal), and some jurors to find guilt of Count II, and others to find guilt of a completely uncharged offense occurring at a third or even a fourth location.
United States v. Gipson, 553 F.2d 453, 457-58 (5th Cir. 1977) ("The unanimity rule ... requires jurors to be in substantial agreement as to just what a defendant did as a step preliminary to determining whether the defendant is guilty of the crime charged."). Here the jury is so lacking of any details of which crime is being deliberated, the jury is free to imagine any place and any time within 24 hours, and to imagine any shotgun they have never seen as evidence. The jury instruction is completely void of the place of the alleged crime other than Linn County some 200 plus square miles of territory. This lack of detail is fatal as Count IV the uncharged offense submitted was inside of a vehicle some ¼ mile from the residence at 10Pm; Count II as charged was inside of the residence of Mr. Waggoner at some time before 9:20Pm. One offense involved an unknown shotgun, the other a specific "Remington shotgun"; one alleged offense involved law enforcement officers, the other did not. There is no way of knowing which juror found the state had proven the elements of either accusation charged or uncharged, as there is no offense specified, no time specified, and no location specified. The State refers us to no case holding a general verdict proper upon the trial of an indictment or information charging an appellant with the commission of two offenses in one count; the state actually did not charge two acts, but the court adamantly believed it had. An accused is entitled to the concurrence of twelve jurors upon one definite charge of crime.
Waggoner's case involves the instruction to the jury as instruction number 6 and the verdict thereof. Some of the jurors may have agreed appellant was guilty of an offense committed inside *651 of the home some hours before officers arrived on the scene as charged in count II, while others may have reached the same result with respect to an offense committed at the second alleged crime at a shooting range some 250 yards from the home as argued at closing argument, while others may have by pure speculation inferred a violation occurred at the skeet shooting range behind the home, and others may have found the violation to have occurred while occupying a vehicle down by a pond on the property as argued by the State also in closing. No person actually testified Waggoner had exhibited a shotgun, and no shotgun was ever shown to have been at any time lethally capable, further no person had actually seen Waggoner with a shotgun, and yet further no person had seen any shotgun used as a weapon. It cannot be determined that there was a concurrence of twelve jurors upon one definite charge of offense, that it was what the state had actually charged by information, or that any one or more separate acts constituted all of the required elements but occurred at different times and places which the jurors simply pieced together to use elements from here and there to combine into one patchwork offense. Some jurors might have viewed the shotgun introduced as evidence and found inside the home the shotgun exhibited, or not, and others found another unseen and unfound shotgun from the shooting range was exhibited, others some unknown shotgun discharged from a vehicle, while others might have found some other shotgun was exhibited at any time anywhere in Linn County, there simply is no way to tell. The instruction is void of the location charged in Count II "inside of the residence at 36417 Nickle Road" and is also void of the required element of a weapon "exhibited a shogun, a weapon, readily capable of lethal use" as charged by the information.
In State v. Mitchell, 704 S.W.2d 280 (Mo. App. S.D. 1986), the court reversed a defendant's conviction of two counts of unlawful use of a weapon, where the verdict directors for each count were identical, even though the allegedly unlawful conduct occurred in two different locations on the same day. Id. at 286. In finding that the lack of differentiation between the two counts required a new trial, Mitchell emphasized that "defense counsel, through cross-examination of the State's witnesses and the presentation of defense witnesses, sought to discredit the State's evidence and to extenuate defendant's conduct at [the first location] and at [the second location]"; accordingly, "the jury ... had to decide whether defendant's actions during either, or both, of the incidents mentioned in the evidence constituted [one violation by acquittal of the other, or two violations, or no violation at all] but under the instructions there was no way to determine how they had done so. Here the Trial Court demanded the State somehow choose to submit an illegal instruction of a Count uncharged as a lesser included offense of Count I, or as a completely new uncharged offense altogether. The prosecution and the Court seem to have been at a total loss as to what is being submitted to the jury or where it is charged in the information. It was not until after submission to the jury that the Judge even makes record of what has been submitted, and even then there is confusion. The instruction for Count I and Count II was so lacking and vague the Judge actually believed the State was charging Count I and II as the same offense, although separated by distance and time one being inside of a residence and one being outside at a shooting range or in a vehicle. The prosecution argued only the new theory to the jury, and did so again in the penalty phase, there is nothing to even infer the state submitted the offense it charged, something the State conceded on appeal. The appellate court refused to address the issue, claiming the crime with which he was charged was the same crime. This is true just not the criminal action which constitutes an offense and thus is a crime that was actually *652 charged. The court cited nothing to support this new rule of one charge for multiple offenses, and did not publish its findings, to do so would have created new rules and laws. However this court must cite legal authority, sufficient to allow for higher court review.
Under the unanimity rule, jurors must be "in substantial agreement regarding the defendant's specific conduct" as a necessary prerequisite to a finding of guilt. The specific act of Exhibition of a Weapon was not presented in the disjunctive it was presented as any generic offense of statute at any location charged or not. But while Waggoner was only accused of one type of generic conduct which constituted a crime, the evidence would have allowed jurors to find that he engaged in elements of such conduct on any one of multiple different occasions and separate locations. Thus, although the verdict director referred to only a single kind of generic act, they effectively charged Waggoner in the disjunctive: under the instructions the jury could convict him if it found that he exhibited a shotgun in the presence of one or more persons, in an angry or threatening manner, inside of the residence before officers arrived, or while occupying a vehicle down by a pond at 10:30 Pm after officers arrived, or at the skeet shooting range in the rear yard of the home at some unknown time, or at the lighted rifle and pistol shooting range structure sometime after 10:45 Pm when the suspect was no longer believed to be in a vehicle, or at any other time and place within 24 hours of that day and within the County of Linn, Missouri. These incidents were all separated not only in location, but also in time each a separate offense each could have been charged in separate counts. The State was very specific as to the locations at which particular alleged vents occurred. Witnesses although giving no testimony a crime had actually occurred and in fact disproving the State's accusations, provided various statements and testimony to indicate that the events occurred at different times, and were not part of any uninterrupted course of action, events beginning at 3:30 pm and continuing until 11:50 pm when the officers left the home after conducting an illegal search and seizure to manufacture evidence and simply elected to leave.
The jury-unanimity requirement cannot simply mean that the jurors had to agree that he engaged in actions of a particular nature or type. Consider a defendant charged with a single count of burglary, but implicated in the burglaries of multiple homes in the County over the same 24 hour time span as submitted in instruction 6. Even if evidence of the multiple burglaries was admitted at trial, I assume this Court would reverse a conviction if the jury was instructed in a single verdict director that it was required to find only that the defendant, during this 24 hour span, unlawfully entered the (unspecified) property of another with the intent of committing an (unspecified) crime therein, even if he had never actually been charged with that specific crime at all. I assume this Court would have no difficulty concluding that such a generic submission violated the defendant's right to a unanimous verdict, even though the hypothesized instruction describes a single type of conduct which the defendant allegedly committed (i.e., unlawful entry into the premises of another with the intent of committing a crime inside). The due process violations, and double jeopardy concerns would only give rise to mandatory vacation of any verdict.
The Trial Court's conclusion in complete error that the jury-unanimity requirement was satisfied cannot be squared with Mitchell, 704 S.W.2d 280. Mitchell also involved separate incidents involving the same generic type of conduct: knowingly exhibiting a weapon in an angry or *653 threatening manner in the presence of one or more other persons. Id. at 284. The identical verdict directors in Mitchell were erroneous, since they identified "the specific act" of unlawful use of a weapon (among several alternatives, see § 571.031.1(1)-(8), RSMo Cum. Supp. 1983); Yet despite the identification of a specific type of unlawful use of a weapon in the verdict directors, Mitchell found the instructions erroneous because "it was impossible for the jury to know which incident was the subject of which verdict director, id. at 284, and the two incidents could have been readily distinguished by location. Id. at 285. Here the court was required to identify the specific criminal action which it was submitting and had it done so it would have realized there had been no such specific criminal action charged at all by the prosecution and therefore it could not instruct on an uncharged offense over which it had no jurisdiction.
The Missouri Approved Instructions address a similar situation, where a defendant is actually properly charged and stands accused of multiple similar offenses. Where distinction of multiple offenses by time is not possible, the MAI-CR 3d directs that "the instruction should be modified by the Court to identify the occurrence by some other reference." MAI-CR 3d 304.02, Notes on Use 4(c). The Notes on Use go on to specifically observe:
The place of the offense may become of "decisive importance" under certain circumstances, such as ... where the defendant may have committed several separate offenses ... at the same general location within a short space of time.
In such a situation, upon request of the defendant or on the Court's own motion, the place should be more definitely identified such as "the front bedroom on the second floor," "the southeast corner of the basement," etc.
As these Notes on Use suggest, the trial court in this case could, and should, have included more specifics as to the location or other distinguishing characteristics of the separate incidents described in the evidence, any one of which could have, but in this case did not, support Waggoner's conviction of an uncharged offense. The problem faced by the court was that any inclusion as to the location of the alleged criminal act would be submitting an uncharged offense and clearly documenting the error. See also MAI-CR 3d 304.16 (pattern instruction for alternative submissions under a single count). It is more important - not less - that the jury be given as specific direction to guide its deliberations as the State's accounts will permit. Here, the State's elicited testimony plainly lent itself to distinguishing particular separate claimed events, or groupings of events, based on the location where they allegedly occurred, a form of distinguishing reference which the MAI-CR 3d specifically endorses. While this may not have forced the jury to focus on individual events, it would at least have required the jury to make findings that considered only the criminal conduct which was actually charged by information, and given some assurance that the jury in fact unanimously agreed to his guilt based on that specific accusation, which obviously must be the same accusation at the same time and place as charged in the information and no other, IE exhibiting a weapon at another location outside of the residence to persons who arrived after the criminal acts as charged in count II had been completed and a new criminal action had begun.
Obviously the instruction allows jurors to choose any element, find it occurred at any place and time, then combine another element with it at some other place and time, to choose any victim *654 whether inside outside day or night, then choose any of several alleged exhibitions, then choose where and when the defendant may have been angry or threatening, then further when and where it believed a shotgun could have been readily capable of lethal use, as well as when and where he did any one of these things knowingly or not. Obviously such a patchwork verdict is impermissible. There simply is no possible way to know where when or if the jury found he had done all of these required elements in one place at one time, knowingly, or that it was even possible at all without using evidence from multiple separate acts including uncharged criminal actions. Such an instruction for DWI would run afoul as a jury could determine that the defendant was intoxicated, that he had operated a vehicle, and that he did so knowingly. The problem is he could have operated the vehicle at 9am, become intoxicated at noon, he has still operated a vehicle and he was intoxicated, just not at the same time; and not at the same place, and not as one criminal action. The state itself relies on just the same patchwork of elements in its reply to the primary point on appeal, using elements from inside the home, elements from outside the home, relying on the fact they heard a gunshot come from the location of the vehicle to prove a lethally capable firearm, then using shotgun shells found 200 yards away from that location not even remotely considered evidence, to infer a shotgun must have been present at the shooting range, then back to the events inside of the home to infer an angry manner, and threatening manner, then back outside to say there were people present because the deputies were there shining their lights at him, and he would have known a light has a source, the problem is the state has combined two separate criminal allegations at two separate places and times, to try to prove all of the elements of one offense, this is of course impossible because there were not two separate criminal offenses charged, and even if there had been the instructions must clearly separate each separate criminal accusation. The state explains that it does not matter where or when each of the elements occurred just that each element was inferred by the state somewhere at any time. The state's argument falls flat on its face because as noted above one can operate a vehicle, one can be legally intoxicated, one can do both of these things knowingly on the same day in the same County. But if the state charges DWI in one count which occurred at 9am, then charges public intoxication at noon; the state cannot say oh well be was drunk at noon and he got a blood test that proved a BAC in excess of .08 at noon, but he was operating a vehicle at 9am, so well the jury will have to find he was drunk and he knowingly operated a motor vehicle. There is no evidence he did both of these things at the same time; but yes, if the jury is simply instructed that they only have to "find beyond a reasonable doubt that on or about January 1, 2014 in the county of Linn; the defendant; First was intoxicated at a BAC of .08; and second that he operated a motor vehicle, and third that he did so knowingly; then you will find the defendant guilty of DWI. Obviously he did all three of these things, just not at the same time or place. Obviously he did not commit an offense, but the fatally flawed instruction causes a patchwork verdict. The same applies here, and is impermissible. It is apparent from the Judges determination the state was choosing to submit an accusation it had not charged, that the instructions as given could cover any one of several accusations, separately or combined as one single lengthy act. The jury was simply not asked to distinguish between these separate acts, or instructed they could not use multiple separate acts to form one patchwork verdict of guilt by combining several actions at different times and places to satisfy various elements of the verdict's director of guilt which must occur as one act, at the same time and place, to the same victim(s) using the same evidence. For this reason the verdict cannot stand and must be reversed. The court may well find this point moot *655 as explained herein due to lack of jurisdiction, or other dispositive points. As it is a point of general interest to this court for future protection of the Constitutional Rights of the accused it should be addressed.
(o.) THE PROSECUTION AND JURY WAS IMPROPERLY ALLOWED TO ASSEMBLE EVIDENCE REQUIRED TO PROVE THE ESENTIAL ELEMENTS OF THE UNCHARGED CRIME SUBMITTED BY PROVING SOME ELEMENTS AS CHARGED IN ONE CRIMINAL ACT AND ADDING OTHERS FROM THE SECOND SEPARATE CHARGED ACT. One cannot prove some elements at one location, then swap victims, swap firearms, and rely on actions and evidence that occurred after the first act had ended, and a new act began, all of the elements must be proven at one location and at one time.
The evidence relied on is contained in the trial transcript. Other evidence is contained in the point related to insufficient evidence of the uncharged act submitted and argued to the jury and another additional point related to lack of proof of the charged act as found in Count II.
(p.) SEPARATE CRIMES REQUIRE SEPARATE CRIMINAL CHARGES, EXHIBITING ANY OTHER UNIDENTIFIED WEAPON AT ANY LATER TIME ANYWHERE EXCEPT "INSIDE THE RESIDENCE" AS CHARGED IN COUNT II, REQUIRES AS A MATTER OF DUE PROCESS THAT THAT CRIMINAL ACT BE CHARGED BY DESCRIBING EACH SEPARATE ACT "AS NEARLY AS CAN BE DONE" IN A SEPARATE COUNT. The State cannot charge twice for the same alleged criminal conduct.
See State v. Pope, 733 S.W.2d 811, 813 (Mo. App. 1987) (holding that, "when the [specific criminal] act was specified [in the indictment] ... the jury can convict only on that act[,] [such that an] instruction which allows them to convict of ... another [act] which is not charged cannot stand"). See State v. Barber, 37 S.W.3d at 403-04 (holding that, in enacting section 571.030.1(4), which makes it an offense for a person to knowingly exhibit, in the presence of one or more persons, any weapon readily capable of lethal use in an angry or threating manner, the legislature intended to permit a separate conviction for each angry display of a knife in the same fight or transaction)
The trial court plainly erred by allowing the prosecutor to base his submission on a criminal accusation of exhibiting a weapon not charged, submitting Instruction No. 6 to the jury, and in imposing judgment and sentence upon the jury's verdict, because these ruling violated the accused's rights to due process of law, to be given notice of the charges against him and to prepare a defense, as guaranteed by the Sixth and Fourteenth Amendments to the United States *656 Constitution and Article I, Sections 10 and 18(a) of the Missouri Constitution. The argument and instruction to the jurors allowed them to return a verdict against the accused for a criminal accusation with which he was not charged because Count II of the amended information charged him with exhibiting a weapon inside the residence in the presence of one or more persons, but the argument, instruction and verdict was based on a new uncharged criminal accusation of exhibiting a weapon outside the residence some hour later at a shooting range in the presence of law enforcement officers, this is a separate act which must be charged in the information as Count I by choosing to charge correctly or as Count IV in the alternative by dismissing count I prior to trial, of course Count I would have to have been charged on the criminal complaint when originally filled had the State wished to proceed to trial on such a separate criminal accusation. The prosecution could not amended its information due to the fact this new uncharged criminal accusation is a new act, and is not a lesser included offense of the criminal accusation charged in Count I, discharging a firearm from a motor vehicle.
"It is elementary law that an accused cannot be charged with one offense and convicted of another." State v. Gant, 586 S.W.2d 755, 762 (Mo. App., W.D. 1979). Here, the State charged Mr. Waggoner with unlawful use of a weapon for exhibiting a weapon inside the residence, any other theory of any other criminal accusation occurring at any later time and place, and any new victim requires that the accused by criminal complaint be properly charged, and subsequently charged by information or indictment prior to trial. Thus, as a general rule, due process mandates that a criminal defendant may not be convicted of an offense not expressly charged in the information or indictment. State v. Hibler, 5 S.W.3d 147, 150 (Mo. banc 1999). "It is axiomatic that a conviction upon a charge not made or upon a charge not tried constitutes a denial of due process." State v. Miller, 372 S.W.3d 455, 467 (Mo. banc 2012) (citing Jackson v. Virginia, 443 U.S. 307, 314, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). "An instruction that allows [the jury] to convict of that act or another which is not charged cannot stand." Miller, 372 S.W.3d at 467 (citing State v. Pope, 733 S.W.2d 811, 812 (Mo. App., W.D. 1987)).
A statutory exception to this rule is found in Section 556.046, providing that a defendant may be convicted of a lesser-included offense of the offense charged in the indictment or information - the rationale being that, for purposes of due process, a defendant is considered to have notice of included convictable offenses, any of which may result in a lesser accusation due to the criminal actions as charged not being fully proven sufficient to submit the greater offense. State v. Collins, 154 S.W.3d 486, 494 (Mo. App., W.D. 2005). An offense is considered an included offense for purposes of Section 556.046, when:
1) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or
2) It is specifically denominated by statute as a lesser degree of the offense charged; or
3) It consists of an attempt to commit the offense charged or to commit an offense otherwise included therein.
Also, the included offense must be based on the same criminal conduct alleged in the information or indictment as to the charged offense. Hibler, 5 S.W.3d at 150.
*657 Here, the lesser-included offense exception does not apply because the State did not submit Count II as a lesser-included offense of Count I. Nor could it. The State was required to charge two separate allegations of criminal conduct each of which are separate offenses to be charged as two separate Counts of criminal conduct. If the State wished to charge exhibiting a weapon for the criminal conduct alleged in Count I for discharging a firearm in the presence of law enforcement it was free to do so, the prosecution elected to charge discharging a firearm and was thereafter held to proving the elements of that crime or any lesser included offenses. As exhibiting a weapons is not a lesser offense the court was barred from allowing the state to continue based on the criminal conduct alleged in count I. As the court properly noted "you cannot charge him twice for shooting from that vehicle ..."; but the court itself allowed just such a second charge to be submitted in violations of Section 556.046. In error simply calling this submission Count II because the court believed Count II was an impermissible second charge for the same criminal conduct, or accusation of criminal action by shooting from a vehicle did not change the allegation of criminal conduct of Count II exhibiting a weapon inside the residence to the conduct alleged in Count I, nor did it make Count II a lesser included offense of Count I. The court in allowing the prosecution to "choose" to submit either the charged offense of Count I, or a Count II based on the same conduct of the Count I which did not exist except in the mind of the Judge, who was unaware of what was actually charged by information, committed plain error in instructing the jury as to an uncharged offense, which was not a lesser included offense of the conduct as accused and charged in Count I. In essence the court submitted no counts to the jury, it submitted an existing unused instruction based on new criminal conduct which said in the face in error was Count II, not Count I as would be required if the jury was to base its deliberation on the a lesser form of the criminal conduct alleged in Count I.
There is nothing in the record to refute the submission of an uncharged criminal accusation. The state conceded this fact and in no way even attempted in the reply to appeal to infer the state had proven what it did charge in count II, relying primarily on the accused criminal conduct as alleged in Count I. The court has never instructed the jury to deliberate as to count II, the court never even knew what was charged in count II, so it goes without saying there can be no conviction of the offense charged or the criminal conduct alleged as charged in Count II. The prosecution was told to proceed based on the criminal conduct as alleged in Count I by choosing to submit based on that conduct, in essence the court created a new Count II by simply ignoring what was charged in the real Count II. The record is clear as to this fact, and the State cannot argue otherwise. As the defendant has not been convicted by a jury of the singular count of exhibiting a weapon, it goes without saying the non-existent conviction cannot stand and must be held for naught.
(q.) INSUFFICENT EVIDENCE TO SUPPORT THE VERDICT OF THE UNCHARGED OFFENSE AS SUBMITTED AND ARGUED TO THE JURY. The state attempted to overcome the lack of evidence but failed miserably. In order to convict the state had to prove a shotgun was at the location of the criminal conduct as alleged in the uncharged exhibition "while shooting from that vehicle". The state's first problem is there is no evidence of a shotgun being present at the vehicle or shooting range at all. A gunshot heard off in the distance assuming arguendo the *658 officer was not committing perjury again, does not make that gunshot sound come from a shotgun. The appellate court attempted to overcome this problem by simply stating shotgun shells were found in the vicinity of the vehicle, however this is incorrect, only 2 shotgun shells were found some 250 yards away, at a skeet shooting range near the home, not anywhere near the vehicle, in addition only rifle shells were found at the shooting range by the vehicle, it would be only logical to assume any gunshot came from a rifle, the fact several different calibers of shells including center-fire rifle and rim-fire rifle or pistol shells of several different lengths were found within 10 yards of the vehicle would raise serious doubt as to any alleged gunshot coming from a shotgun, hearing a shot in the distance does not prove it is a shotgun, and not a single officer testified he heard a shotgun shoot, only a gunshot, or what he believed to be a gunshot. The fact the only shotgun admitted into evidence was found upon their arrival inside of the residence unloaded and broken, where it remained in the control of the officers during the entire time of the alleged gunshot being heard and was eventually seized from the same location, would require the jury conjure up some imaginary shotgun at the vehicle or shooting range, which was never seen, and never seen with the accused, who was never seen with any weapon. The state cannot base its entire proof of this element on speculation with no evidence of the existence of a shotgun.
The second problem is the state never placed the accused at the vehicle or proved he fired any weapon of any type, no person identified the accused as having taken the vehicle or being associated with it. I am sure the state will argue this point, but no person ever identified who the "he" was that was referred to as taking the vehicle. In addition there was no evidence whoever took it remained at all, we must be mindful two officers committed perjury on the stand. In any event even the judge claims "I don't think you even put him at the scene" where the judge doubts you have placed the defendant at the scene this is reasonable doubt. No person saw anyone fire a shot, no less the defendant, nor did anyone see him anywhere around the residence or the vehicle with or without a firearm, again, no person testified who was present on the evening in question or how many persons were in the area of the vehicle, or carrying weapons.
No person ever saw the accused, or had any idea what his emotional state was, angry, happy, mad, threatening, asleep, awake, or dancing a jig. The state certainly did not prove any angry or threatening, which is not based on the victim's perception of the act, but rather the actions of the accused, actions never seen. It is perfectly conceivable whoever fired a firearm if they did, could have been doing so in celebration, or to eliminate a snake, or a tin can, maybe a waskly wabbit.
The state adduced no evidence anyone was within a range for a shotgun to be readily capable of lethal use, from 200 yards away in the dark, it is hard to believe a shotgun can ever be lethal, it sure won't kill ducks at 100 yards, any attempt at killing a human would be as futile as throwing rocks at passing jetliners. Without expert testimony as to some super shotgun which can be lethal from 200 or more yards away in the dark, the state could not prove readily capable of lethal use, not that you can buy non-lethal shotgun ammunition, blanks, beanbag shot shells, flares, or some other 20 or more types of non-lethal ammunition which sounds just like any other discharge, or the inescapable fact that shotgun pellets especially the skeet shot introduced by the state due to this thing called gravity and aerodynamics will not travel 100 yards due to physics would have prevented proving this element. The simple fact is you can point a shotgun at a fly from 200yards away and there is no chance you will ever put his eye out, simple ballistics and physics. You *659 would have a better chance driving golf balls at the victim, or spitting watermelon seeds, it is simply irrational to even contemplate a shotgun will kill a human from 200 yards away.
The State next had to prove that the shotgun was being used as a weapon. Defined as "an instrument of offensive or defensive combat". The state simply cannot offer any proof of this element at all, no person saw the accused anywhere on the property, with or without any firearm of any type, no officer had any contact with the accused, spoke to him, or heard any communication from him of any type. There was no evidence anyone at the shooting range could even know the officers were present at all, other than they allegedly shined a hand held flashlight at an unoccupied vehicle some two-hundred yards off in the distance. In addition there is a shooting range within the immediate area of where they alleged the sound of the gunshot came from, people shoot at shooting ranges; that is after all what they are for. Just as people play baseball on a baseball field, hearing the crack of a bat hitting a ball, sure does not make exhibition of a ball bat as a weapon readily capable of lethal use. This element was not proven, if even inferred at all.
Next the State had to prove someone was in the presence of the accused, 200 or more yards is not in the presence, unless when you use the toilet in a super Wal-Mart you do so "in the presence" of every person in the entire shopping center and the McDonald's across the street. I think 200 or more yards away in the dark, unseen, and with no evidence anyone knows you are present, eliminated "in the presence". Obviously one would not be exposing himself to urinate "in the presence" of everyone within a 200 yard radius of the toilet, even assuming arguendo everyone could hear him urinating.
Next The state had to prove that the actions were knowingly, meaning the accused knew his combatant was there in his presence, his shotgun was readily capable of killing the combatant when he exhibited it to him (impossible due to physics), that he was perceived as being angry or threatening to him, and that the person being exhibited to could observe his exhibition, and conclude it was intended to display a weapon during combat for his inspection. I can't see how anyone could know he was exhibiting a shotgun to someone in the dark 200 yards away or that they had super human vision and would see it, or that the accused could simply ignore all of the laws of physical and irrationally believe he could kill some human so far away the projectiles will fall to earth some 150 plus yards before reaching him, less lethal than a spit ball across a classroom, or that it would be perceived as being angry, or threatening, of course to do so you must by pure speculation assume the accused even knew they were there at all, was facing in their direction when he fired the firearm, which of course must be a shotgun, and that the accused was not simply shooting at the shooting range unaware of the officers presence, or that they had been called, arrived with their lights and sirens off, or were sneaking around the residential area of the property at all.
So just to recap, the jury has to imaging a shotgun that has never been seen or recovered was in the hands of the accused and no other person; ignore the fact no shotgun ammunition of any type was ever found anywhere near where the exhibition and alleged discharge occurred; that the ammunition presented was incapable of lethal use from 50 no less 250 yards; ignore the fact there really is no person in the presence of anyone else with a firearm; they must then conclude that the *660 noise the officer heard was in fact a gunshot and not something else, if indeed he is not lying again; then conclude that the accused must have been in some offensive combat with the persons he has never seen or spoken to and has never had any contact of any kind with; that the accused has some new super ammunition for his shotgun which quadruples its maximum effective range on ducks and is now lethal to humans at 200 yards away (which is laughable), then assume that he had to be angry or threatening in some way; that he intended to do all of these things and knew someone was in his presence, within range to be readily killed during his exhibition, and that someone would see his exhibition and take it as an offensive criminal action; and further then purely speculate that the accused was not simply shooting a rifle or handgun at the shooting range, where as the prosecution conceded "is a place where he shoots all the time" and where he himself presented evidence of rifle and pistol shells that prove beyond any reasonable doubt that is exactly what was occurring, even recovering a magazine for a .22 rifle from the shooting bench as well as multiple boxes of un-fired .22 rim-fire shells, something one normally finds at a shooting range, just like golf balls at a driving range or gasoline at a gas station.
There is no juror alive who could conclude the sound heard was a shotgun, there was not a single piece of evidence presented to allow it, no officer testified he heard a shotgun, just because the prosecution says that is what it was, because that was what was charged in the actual count II, not a firearm as charged for the alleged discharge of a firearm from a vehicle in Count I. The State was well aware there was no proof of a shotgun ever being at the location of the shooting range, thus alleged a firearm. The facts are simple the jury could not have found a shotgun was exhibited as the state argued and as the instruction was based upon. Without some evidence of some new super shotgun ammunition readily capable of killing the nearest human around to see or even hear the exhibition some 200 yards or more away, the state's case fails; this simply is not a case of someone pulling out a gun and threatening another person or persons, nor is it a combative fight with a weapon drawn, nor is it even proven that whatever the sound was occurred even from a firearm no less a shotgun, as instructed. But of course this is moot as there was no charge of any such exhibition, so even if the jury found all of these things to have occurred, it invalidates the verdict, because that is not related to the criminal conduct as alleged in Count II, which the court at sentencing claims was the finding of guilt and basis of the sentence. So in the next point must disprove this possibility of conviction based on what was actually charged, but never submitted to the jury.
(r.) INSUFFICENT EVIDENCE TO SUPPORT VERDICT CONVICTION AND SENTENCE BASED ON COUNT II AS CHARGED.
No person testified the accused was on the premises during the time, whatever that time may have been, as the state adduced no specific time frame when the alleged exhibition occurred inside of the residence. No person saw the accused exhibit a shotgun or any firearm anywhere inside of the residence, there was no testimony by any person that any exhibition had occurred at any time, readily capable of lethal use or not. This of course is fatal to the state's case. In addition the states only witnesses refused to support the State in any way, and further refuted the state's evidence to such a point as to diminish the state's theory to wishful thinking and nothing more. The state offered no evidence a firearm of any type was ever loaded thus capable of lethal use while inside of the residence. The state offered no person who was present when any such firearm was used as *661 some form of an instrument of combat, offensive or defensive. The state offered a single firearm, a Remington shotgun which was unloaded, and was broken incapable of any use other than as paperweight obviously incapable of being lethal. The state offered no eyewitness testimony of any person who had witnessed the accused hold a shotgun, or exhibit the same unloaded or loaded, it further offered no evidence that the accused was inside of the residence with any other person present at any time. The state offered no evidence that while holding a shotgun to be exhibited which was loaded, the accused was angry or threatening to any person. It did elicit testimony from the only eyewitness to testify that he had never seen the accused with a gun, or seen him shoot a gun, the accused was not his dad but his stepdad who he called father, and that he did not remember why he called 911, and further that he did not hear any gunshots, and that he had no idea where the accused was when he called 911. The state offered no evidence that the accused intended to use a shotgun loaded or unloaded as an instrument of combat against some other person. And of course the State offered no evidence that the accused did any of these things knowingly and with some purpose as to his conduct. Additionally the State failed to offer any evidence to eliminate possession of a weapon inside of the premises by any other person, nor did it offer any evidence the accused had ever owned or handled the shotgun found unloaded inside the residence. The state further offered no evidence as to what had occurred prior to the arrival of law enforcement, who or whom was responsible for any damages to the structure or any other testimonial evidence related to what had been accused as an exhibition of a shotgun readily capable of lethal use inside of the residence. The state failed to even infer an exhibition had occurred. No person, including the officers after arriving, saw a firearm loaded at any time inside of the residence, no person witnessed an exhibition of a shotgun inside of the residence by any person, no person stated they had been threatened in any way shape or form, no person testified the accused was angry at any time, including inside of the residence, no person testified there had been any weapon readily capable of lethal use ever in the possession of the accused, and in addition no person testified the accused knowingly exhibited anything to anyone with some purpose, knowing the conduct would be considered a criminal action. In short just as the Prosecution abandoned the imaginary accusation of exhibition inside of the residence, the State in response to appeal as well as the appellate court simply threw out any hope of even inferring an exhibition had occurred, lethal or not of any weapon, opting instead to concentrate on the uncharged act of exhibiting a shotgun while discharging a firearm at the shooting range, misapplying the law by stating it did not matter what the state charged if appellant exhibited a weapon any weapon, to any person, anywhere, because the statute does not require it be inside of the residence or in the presence of someone other than law enforcement. This simply does not work for the state, it in essence is admitting the prosecution did not prove what it charged, but rather proved some other act, which is also a second uncharged violation of the same statute law. The problem for the state is the state cannot rely on any proof elements from the criminal conduct of Count I to prove the criminal conduct alleged in Count II, because they are not related to each other. Double Jeopardy prevents being charged for the same act over and over again, allowing the state to simply try again and again until it can prove some offense, even if it is one never before charged or announced to the defendant. If this were true the state could simply charge everyone with murder, and work down to whatever the jury eventually finds has occurred, like speeding, or littering, obviously this is not permissible. Obviously the prosecution in no way proved what it charged in Count II, that the defendant exhibited a shotgun inside of his residence For this reason *662 the conviction is a nullity, and no conviction of Count II has ever occurred, simply because it cannot, as no jury has ever been asked to find quilt or innocence of the criminal actions as alleged in Count II.
(s.) self-explanatory, two offenses on charged on not, no description of either on instruction 6.
(t.) The entire criminal act WHICH WOULD BE AN OFFENSE OF THE STATUTE cited in count II is impossible to commit without a firearm loaded with ammunition readily capable of lethal use being inside of the residence to be exhibited and some witness to the exhibition, merely finding an unloaded dysfunctional shotgun as pictured and offered as state's evidence item #1 is far from proof of any violation of the statute cited. It is impossible to exhibit without a person seeing it, or present to be involved in some combat. Not a single witness testified they had ever seen a shotgun inside of the residence in the possession of Defendant, or that Defendant had exhibited it to them, there was also no person that testified any firearm was ever readily capable of lethal use, or that any shotgun or weapon of any kind had been used as a threat inside against anyone, or as angry against anyone, during some knowing action against some also unknown persons, the jury nor any rational person can conclude the Prosecution proved any one no less all of the elements of the offense, or that there were the persons or items there to even allow it.
(u.) Deputies showed jurors four firearms belonging to defendant which were not related to alleged crimes and were inadmissible. Officer's statement of "they won't need these he's guilty anyway" tampered jury. Witnessed by state's primary witness, who will testify if called to do so or can file the affidavit if needed. Was coming to new trial hearing as witness, but court changed the date a week early without telling anyone to prevent this and other witnesses from testifying as to the obvious violations of the court addressed herein, will rely on testimony of Samantha Waggoner, New Mexico.
(v.) Judge admitted to sending him in there said "I watched him the entire time, funny can't see the jury room through the two closed doors and down the hall to the right, now can you, hope he shows up to evidentiary hearings and lies again, he is not a judge now, and perjury is a crime. Will rely on testimony of Sheriff Tom Parks and jurors.
(w.) self-explanatory, read the PCR motion.
(x.) Lied to all witnesses and family, entered a change of date AFTER hearings had been held a week early, lied about council being present (see Docket), then lied to me also, came to the jail removed me and had hearings unannounced a week early, no hearing really, just well you're going straight to prison, then stole all of my paperwork when I got to the prison, and refused to file my appeal forms, or appoint appellate council. All documented, even the return of all my legal documents some 45 days later. There is a transcript you know and the dates are all in the docket, as well as case.net, I have the notice to a witness a day after saying the date had been changed, oh and in closed court, no public no witnesses, no council.
(z.) Appellate council failed to raise the main points herein, even though I myself briefed them for her, asked her not to send until I approved and if needed corrected or revised, she said *663 would not brief the points, but if I felt she was wrong I could bring it up here, so here we are. Lack of jurisdiction was a primary point, she simply said I had not been charged with the same crime, the appellate court said a crime is a statute, well obviously they are right, and act which is a crime is an offense, they used a play on words to uphold the conviction but would not publish same. Obviously they cited no one case to support their new all crimes are the same offense theory because they all have the same elements, doesn't matter where or when or if in multiple places as long as each element was proven. I wouldn't have published that either, pure bull.
See Unpublished memorandum for guidance WD. 2014 will rely on testimony of attorney Amy Bartholow, Columbia Mo.
(aa.) self-explanatory, see trial transcript missing lines, and discussions off the record.
(bb.) State bears all the burden of proving it did not affect the jury, judge admitted to it, it is also one of the "discussions held off the record" IE: just delete that for me would ya dear will rely on testimony of Sheriff Tom Parks and jurors.
(cc.) State bears all the burden of proving it did not affect the jury, judge admitted to it, it is also one of the "discussions held off the record" IE: just delete that for me would ya dear. Will rely on testimony of Sheriff Tom Parks and jurors.
(dd.) Prosecution was well aware there was no truth to count III, there was no attempt to arrest anyone, and this count was based on his own perjury in order to negotiate a plea deal. Count I a class B felony is not an act which can be an offense of statute, it is a completely false accusation of the cited statute, used purely as a prosecution tool. Another count of a Class B felony assaulting an officer, simply was outright prosecution imagined fact. This Count Used to get others to arrest defendant, was complete fiction, the Missouri State Highway Patrol officer himself would not support it, had not been assaulted, and did not appear at any proceedings to lie for the prosecution. Obviously Count II was fictional, no person was witness to any exhibition inside of the residence, nor did anyone testify Defendant ever possessed any firearm loaded or unloaded inside at any time or ever had. Obviously this is prosecutorial Misconduct on a Federally Criminal scale which should be addressed. We must remember he was caught in public drunk as a skunk saying "I'll make up the charges myself if I have to ... he isn't making me look like a fool". When the prosecution throws four charges on the table settles on three for trial, gets caught lying, faking evidence, and having officers perjure themselves, and can't prove a single word of anything he charged, maybe the only way to convict is to make a fifth charge after hearing the evidence, then just make the charge what you think you can get the jury to believe. A fair trial was impossible to begin with, from the very first day they all schemed this all up, just to make a false arrest in another state.
(ee.) self-explanatory.
(ff.) Jurors allowed to run freely around the courthouse on breaks, no person watching them, went out on the lawn, entered the library where evidence was stored and looked at it BEFORE it was admitted including multiple firearms inadmissible evidence, went to lunch with witnesses, roamed around talking to the public just having a fine day as if they were not at a trial at all. All witnessed, some chose to stay some left for lunch, that type of stuff. For all we know they went *664 out back had a big toke, and went to their car for a quick drink or two, who knows, no one was in charge of them at all, they separated, hung out in groups, just a mess.
(gg.) It is very simple a shotgun cannot be readily capable of lethal use to anything no less any human from two-hundred yards away. The victim and whoever if anyone discharged a shotgun was never within the effective lethal range of any shotgun, even giving the state every possible inference the act is impossible. 1. The only shotgun offered up as evidence was in the deputies possession at the time after their arrival the deputy alleges he heard a gunshot, he never mentioned hearing a shotgun nor did anyone else, you would have to purely speculate that from no evidence. No person testified they saw Defendant with any firearm of any kind not to mention a shotgun. 2. The ammunition offered up as evidence to the jury, low brass skeet shells, simply cannot be used for anything past 50 yards, the shot will not travel 200 yards it is physically impossible to kill a human at 50 yards no less 200 which is four times the readily lethally capable range of a shotgun. But we don't know if they even fit the fictional shotgun that never was seen, or examined. 3. Hearing what you believe to be a gunshot off in the distance is not an exhibition. You simply cannot exhibit without victim seeing some physical sign of the item's existence, and the victim would have to see some sign of the item (i.e.: a bulge in the pocket from a handgun, fire from the barrel), I cannot find any case where an exhibition occurred without anyone seeing some physical sign of the item, the only reference available is a black jack being used to hit a man in the back of the head, the hit to the head was sufficient along with having the item in his possession upon arrest to beyond a reasonable doubt say he exhibited it and it was there to be seen had the victim turned around to see it. Here we have a sound 200 yards away in the dark made by some unknown means, we simply have no evidence of anything which is a weapon, no less a shotgun or of where it was or if it could have been seen or was behind the levee out of sight at the shooting range or off in the woods somewhere. 4. There is no evidence of the victim and Defendant ever seeing each other, speaking, having any physical contact of any type, any item to meet the elements of the statute must be a weapon "defined by dictionary as an instrument of offensive or defensive combat" here we don't have an item or any combat, there is no visual or physical contact with Defendant of any type therefore there can be no combat, no weapon. It is more likely than not a shotgun is not a weapon when in anyone's possession. 5. There is no way to prove the Defendant had any idea there was anyone else in his presence, simply because there was no other person available, the nearest person was at best some 200 yards away. If you are in a post office parking lot, you are not in everyone's presence at the Wal-Mart a ¼ mile away. 6. There is no evidence of a shotgun ever being at the shooting range, no person saw one there, there was no ammunition for a shotgun found there, the nearest shell casing was found four days after the fact at the skeet shooting range 200 yards plus away, no indication of how long it had been there years, decades, months who knows, pure speculation, in other words there is no sign a shotgun existed at the shooting range or vehicle, and what gauge was the shotgun same or different, what gauge were the shells found at the skeet shooting range by the residence, we have no idea because the *665 state did not offer that up to the jury or any indication of what they were fired from, or by whom; without a shotgun present it cannot be exhibited. Hearing a sound you believe was a gunshot (assuming you are not lying again for the prosecutor) does not make a shotgun magically appear in the hands of some person 200 yards away. There is simply no physical way to make a super range shotgun loaded with some super long range magic shells appear to be exhibited at the location of the uncharged offense, anyone who does so does so by pure imagination and speculation and outright fiction. Ignoring the most important fact, there is no shotgun that is readily capable of lethal use 200 yards away, how could anyone know his weapon was readily capable of killing victim when it simply cannot, it defines all physics, you can shoot at anyone with a shotgun from 200 yards all day long till your arm falls off, bet not a single little pellet even comes close to landing at their feet no less kills them. There was no other person in the presence of any other person with a shotgun, a shotgun found inside the residence where it remained the entire time the deputies were there, unloaded on the floor or some hours later in their car trunk. Using the evidence that gun would have had to get up and fly to get to the shooting range, then load and fix itself, discharge in the hands of someone, then break again, unload, and fly back to the deputies hands, all without them knowing, oh and become somehow readily capable of firing pellets 200 yards accurate enough to hit a human in the dark and reasonably be assured that human would die from it. That is one wild story, hard to believe the entire jury would imagine that anyone could knowingly do all that, or that physics could just stop, gravity and time stop, and shotguns can shoot 200 yards, And guns can animate themselves, just don't think the state proved that happened, simply because it doesn't except in cartoons. Just don't think even if the state had charged that offense it could have proven a single element of it, and I'm right because it cannot be done. From that range you would be better off to just throw the shells with your hand probably go further, maybe even 75 yards if you got a good arm, still isn't going to kills nobody. Kind of goes back to the if a tree falls and no ears are close enough to hear it does it make a sound, well if a shotgun goes off and no one is close enough to get killed is it readily capable of lethal use, guess we know the first answer is yes and the second no. The state miserably failed to prove even what it did not charge.
Relying on physics, gravity, simple education, and common sense here. But if the state wants to call in an expert I would love to hear what he would say, he would be laughing when you ask about killing someone with a shotgun at 200 yards, I'm quite sure of it.
Movant, Lance Waggoner of Shreveport, LA, intends to rely on his own testimony in support of all of the foregoing claims.

Rule 24.035(e), which applies in cases where a defendant pleads guilty, is worded identically.

Riley v. State , 364 S.W.3d 631, 637 (Mo. App. W.D. 2012) ("postconviction counsel cannot discharge his or her duty to determine whether the pro se motion asserts all facts, and all claims, available to the movant, where counsel has failed to examine the record essential to that determination").

See also , e.g. , Moore v. State , 458 S.W.3d 822, 825 (Mo. banc 2015) ("The absence of a record of postconviction counsel's attention to the pro se motion 'creates a presumption that counsel failed to comply with the rule.' " (citations omitted)); Vogl v. State , 437 S.W.3d 218, 229 (Mo. banc 2014) ("When the record refutes the claim of abandonment, however, no independent inquiry is required of the motion court." (citation omitted)).

Tabor v. State , 282 S.W.3d 381, 385 (Mo. App. S.D. 2009) (Luleff inquiry required even though counsel filed an entry of appearance, requested additional time to file a brief, and "forward[ed] ... correspondence to the motion court relating to the 'status of the case' on three occasions"); Gehlert v. State , 276 S.W.3d 889, 892-93 (Mo. App. W.D. 2009) (remanding for abandonment inquiry where appointed counsel entered his appearance, requested guilty plea and sentencing transcripts, and communicated with movant, his daughter, and the court concerning status of case); Poe , 820 S.W.2d at 327 (finding presumption of abandonment even though counsel requested an extension, a trial transcript, and other documents).

"Supreme Court decisions that have not subsequently been criticized, modified, or overruled are controlling authority. We do not presume the Supreme Court has overruled its previous decision unless it proclaims otherwise." State ex rel. Wratchford v. Fincham , 521 S.W.3d 710, 715 (Mo. App. W.D. 2017) (quoting McMillan v. Pilot Travel Ctrs., LLC , 515 S.W.3d 699, 706 (Mo. App. E.D. 2016) ).

I presume that appointed counsel in fact made the handwritten and typed revisions to Waggoner's pro se motion. Nothing in the record actually indicates who made the various revisions reflected in the "amended" motion, however, and the "amended" motion is not separately signed (but instead merely reproduces the signature from Waggoner's pro se motion).

It is also significant that, at the evidentiary hearing on Waggoner's "amended" motion, counsel offered no witness testimony, live or by deposition. The circuit court found that Waggoner had failed to present evidence on twenty of the twenty-five claims discussed in the judgment, and had accordingly abandoned those claims.

Counsel's preliminary statement reads in its entirety:
8. Claims for Postconviction Relief:
Movant was denied his constitutional rights to due process of law, a fair and impartial jury, and a fair trial, contrary to constitutional guarantees under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and under Article I, Sections 10, 18(a) and 22(a) of the Missouri Constitution, because:

This review of the extent of counsel's revisions to the pro se motion is not a prohibited "qualitative assessment" of appointed counsel's efforts on Waggoner's behalf, as the majority contends. Instead, the question is simply whether the record "indicate[s] [that] appointed counsel made the determinations required by Rule 29.15(e)." Luleff , 807 S.W.2d at 498. As explained in the text, a review of the "amended" motion fails to demonstrate that counsel took any action to discharge her obligations under the Rule.